In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-3420

VALERIE MCCANN and LESLIE LINDBERG,

*Plaintiffs-Appellants,*

*v.*

IROQUOIS MEMORIAL HOSPITAL, et al.

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 06-2176—**Harold A. Baker**, *Judge.*

ARGUED MARCH 31, 2009—DECIDED SEPTEMBER 13, 2010

Before FLAUM, MANION, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.*    Behind a closed office door, two co-workers at Iroquois Memorial Hospital, Valerie McCann and Dr. Leslie Lindberg, had a conversation in which they criticized hospital administration. Unbeknownst to them, their conversation was recorded by a dictation machine, transcribed, and handed to those they criticized. Believing that the recording was illegally

obtained, disclosed, and used against them, they sued another employee, Susan Freed, along with the hospital, its Board of Trustees, and its Chief Executive Officer, Stephen Leurck, under the Wiretap Act, 18 U.S.C. §§ 2511, 2520. McCann and Lindberg believe that Freed came into Lindberg's office while they were talking, and that while she was out of their line of sight picking up papers next to Lindberg's dictation machine, she deliberately turned on the machine to record their conversation. Freed responds that she interrupted a conversation of theirs once but not on the date of the taped conversation, and posits that Lindberg forgot to turn off his dictation machine when McCann entered his office. The district court granted summary judgment for the defendants, based largely on inferences drawn from the recording itself. But because the parties presented two different but plausible stories, an issue of fact remains. We conclude that the claims against Freed and the hospital boil down to a swearing contest and should not have been resolved on summary judgment. Even if Freed acted unlawfully, however, the evidence does not show that CEO Leurck knew that, and the only trustee who might have known did not use or disclose the recording, so we affirm the summary judgment of the claims against Leurck and the trustees.

## I. Background

This saga begins with McCann's termination from the hospital, which she resented. McCann was formerly the director of physicians' services, but in early Feb-

ruary 2006, she and several other employees were given a week to resign and told that if they resigned by February 10 they could apply for new positions. McCann thought that this reorganization was really a way for the then new CEO Stephen Leurck to get rid of people he did not like, and she thought she was a target. McCann tried to meet with Leurck to discuss the possibility of a new position, but he did not meet with her until February 10. The upshot of the meeting was that she no longer had a job at the hospital and would not be considered for a new one.

Around the same time, Leurck and the Board of Trustees were also reorganizing the radiology department. This put Lindberg's radiology services to the hospital at risk. The hospital used the services of Lindberg along with another group of doctors, but it voted to use only one provider in the future. They asked Lindberg and others to submit proposals if they wished to be considered for the position of exclusive provider, but Lindberg's proposal would have required a second, unnamed provider along with him. Lindberg disapproved of the way the administration was handling things, and the administration was not particularly happy with him either. Freed, who oversaw the staff who transcribed the radiologists' dictated reports, emailed Leurck and another administrator, Susan Berg, complaining about Lindberg's dictation habits—apparently he began late in the day—and their effect on her staff and patient care. Berg added that Lindberg "let 'politics' get in the way of patient care and safety."

On the afternoon of February 24, 2006, McCann went to visit Lindberg in his office. She no longer worked for the hospital, but she still worked for the Independent Physicians Association, of which Lindberg was president, and she needed Lindberg to sign some checks for the Association. When McCann arrived, Lindberg was dictating a radiology report into his dictation machine. He says that he turned the machine off, and the two exchanged greetings. According to McCann and Lindberg, while they were talking Freed entered the office without knocking. Freed crossed out of their line of sight, picked up some requisition forms that were next to Lindberg's dictation machine, and left. According to Freed, she wanted to minimize her interruption and left the office as quickly as she could. She generally remembered the same sequence of events, but contended that it occurred on February 10 rather than February 24. Freed denied being in Lindberg's office on the 24th.

Somehow, the dictation machine was turned on in mid-conversation between Lindberg and McCann. The time-stamp on the tape—which the parties acknowledge cannot be changed—shows that Lindberg last entered the bar code for a new patient at 3:17p.m. on February 24. He dictated into the machine for just under two minutes. After Lindberg's last sentence of medical dictation, there is a clicking sound, and the recording picks up again in the middle of a sentence in which McCann is discussing the checks she brought for Lindberg to sign. McCann and Lindberg say that some preliminary pleasantries to their conversation were not captured on the recording.

The conversation eventually turned to events at the hospital of which the two were critical. The two discussed the reorganization in radiology and what it would mean for Lindberg, and he asked McCann how she thought the other doctors would fare under the reorganization. McCann described what she saw as Leurck's "pecking order"—a sort of hit list—and Lindberg was at the top. Both McCann and Lindberg criticized the trustees and especially Leurck. During the conversation McCann received a call on her cell phone and spoke briefly about an event she was attending later that day. The call was from her home, and phone records show it was placed at 3:24p.m. At the end of the conversation, McCann noted that she was running late and needed to leave, and the tape reflects the sound of a door closing.

Soon thereafter, Lindberg's dictated reports, along with the recorded private conversation, made their way to another department for transcription. The transcriptionist who listened to the recording emailed Freed, explaining that a conversation critical of the administration had been recorded. The transcriptionist assumed that Lindberg had forgotten to turn off his dictation machine. (The defendants point out that Lindberg had occasionally failed to turn off the machine when he finished dictating, although he says that happened only when his dictation microphone was broken.)

Freed listened to the conversation, advised the transcriptionist to transcribe it, and, because she thought it inflammatory, contacted Leurck. Freed told Leurck that Lindberg had accidentally left on his dictation ma-

chine and advised Leurck to listen to the recording. Leurck then read the transcript and listened to the recording. At a board meeting he informed the trustees about the conversation. He also gave a copy of the transcript to one trustee while another was present in the room. But the day after plaintiffs' counsel sent the hospital a letter accusing Leurck of illegally intercepting the conversation (saying nothing of Freed), Leurck emailed the two trustees and asked them to return the transcript if they had it. Leurck testified that he asked for the transcript's return as a matter of routine business.

In an email, Leurck told the Chairman of the Board that he thought a strong response would be appropriate, and that Lindberg and McCann "need[ed] to be put in their respective places." The chairman added that the recording "may be the crack in the door that maybe [Lindberg] has talked once too much." Not long afterwards, Lindberg's privileges at the hospital were terminated, and he remains there only by virtue of an injunction entered by the Illinois state court in a separate lawsuit. His business is down, because, he says, Leurck told physicians not to send their radiology work to him. As for McCann, Leurck thought she was meddling and spending too much time hanging around the hospital. He banned her from entering the hospital for anything other than healthcare for herself or a loved one.

Lindberg and McCann sued Freed, Leurck, the hospital, and the members of the hospital's Board of Trustees under the Federal Wiretap Act and various state laws. They asserted that Freed intentionally inter-

cepted their conversation, in violation of 18 U.S.C. § 2511(a)(1), and that she disclosed the recording to Leurck, who disclosed it to the trustees, in violation of 18 U.S.C. § 2511(c). They claimed that Freed and Leurck acted within the scope of their employment and that the hospital was liable for their actions. In addition, they asserted that Leurck and the trustees used the recording's contents to justify sanctioning Lindberg and McCann, in violation of 18 U.S.C. § 2511(d). And they alleged that all of the defendants knew or had reason to know that the recording was made unlawfully, as required for liability under subsections (c) and (d). Finally, they brought various state law claims not at issue in this appeal.

The defendants filed for summary judgment, arguing that Lindberg and McCann lacked evidence that Freed had entered Lindberg's office on the date in question. The defendants' argument rested largely on the plaintiffs' initial confusion about the date of the recorded conversation: before the plaintiffs had access to the recording and its date stamp, they thought that the recorded conversation may have occurred on February 10, and had said in their initial depositions that they thought Freed came in that day. However, the plaintiffs responded to the summary judgment motion with additional affidavits, noting that based on new evidence and refreshed recollection—e.g., the date on the recording, as well as the checks Lindberg signed and McCann's phone records—they realized that the conversation they remembered, along with Freed's interruption, occurred on the 24th rather than the 10th. The defendants moved

to strike the new affidavits, contending that they were improper attempts to rehabilitate deposition testimony.

The district court did not explicitly rule on the motion to strike, but it found the dispute about the dates immaterial. The court granted summary judgment for the defendants on the Wiretap Act counts and declined to exercise supplemental jurisdiction over the remaining state law counts. The court's order on summary judgment was based largely on inferences drawn from the recording itself. The district court explained that although the recording did not reflect the pleasantries that Lindberg and McCann said they exchanged before discussing the checks, as one would expect it to if Lindberg had simply failed to turn off the dictation machine when McCann entered, that did not prove that Freed turned on the machine. Instead, it deemed the plaintiff's inferences "metaphysical doubt." The district court concluded that the recording supported Freed's testimony that she did not turn on the machine, and thus that there was no intentional interception, an element necessary to support the Wiretap Act claims against all of the defendants.

The plaintiffs moved for reconsideration, which the district court denied. The court reiterated that the absence of McCann and Lindberg's greetings was insignificant, speculating that Lindberg could have resumed dictating while McCann produced the checks but then failed to turn off the machine a second time. The court also noted the absence of any sound reflecting Freed's exit after she purportedly turned on the machine, ob-

serving that when McCann left, the closing door was audible. Finally, it thought that the interruption in recording between Lindberg's dictation and McCann's voice in mid-sentence did not support the plaintiffs' argument that there was a break between the recorded dictation and the recorded private conversation. McCann and Lindberg appealed.

## II. Analysis

The plaintiffs' first, and most significant, argument on appeal is that a material issue of fact precluded summary judgment on whether Freed intentionally recorded their conversation. In short, they contend that they know the date and time when the recording of the private conversation started, they know the three people who were in the room during the different parts of the conversation, and since all three of them deny turning on the machine, there is an issue of fact as to who did so.

The defendants raise a preliminary question: whether we can consider the affidavits from McCann and Lindberg suggesting that three people were in the room. They argue that the only evidence of Freed's presence on the 24th, as opposed to the 10th, are the affidavits that the plaintiffs submitted in response to summary judgment. In their view those affidavits should be disregarded as contradicting earlier deposition testimony. The defendants point to cases saying that a plaintiff cannot manufacture an issue of fact by submitting an affidavit that contradicts prior sworn testimony. The rule defendants seek to apply is designed to avoid sham factual

issues and prevent parties from taking back concessions that later prove ill-advised. *Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168-70 (7th Cir. 1996); *see Commercial Underwriters Ins. Co. v. Aires Envir. Servs. LTD*, 259 F.3d 792, 799 (7th Cir. 2001). But it applies when the change is incredible and unexplained. *Patton v. MFS/Sun Life Fin. Distrib., Inc.*, 480 F.3d 478, 488 (7th Cir. 2007). In contrast, when the change is plausible and "the party offers a suitable explanation such as 'confusion, mistake, or lapse in memory,'" a change in testimony affects only its credibility, not its admissibility. *Commercial Underwriters*, 259 F.3d at 799 (quoting *Maldonado v. U.S. Bank*, 186 F.3d 759, 769 (7th Cir. 1999)); *Patton*, 480 F.3d at 488.

We agree with the district court to the extent that it found the confusion about the dates to be immaterial. The affidavits do not contradict the substance of the prior testimony—that Freed entered the office during the plaintiffs' conversation—and even if they are contradictory, the plaintiffs have offered a suitable explanation. The contradiction is only as to the specific date that these events occurred, a matter that naturally might be difficult to pinpoint without access to the recording itself. More importantly, McCann, Lindberg, and even Freed all remembered that at some point in February, Freed walked into Lindberg's office while he was talking to McCann and picked up papers from his desk. The plaintiffs initially thought that these events occurred February 10, the day McCann lost her job, but when they were deposed both became uncertain and non-committal about the date and thought they might have

talked on February 22. After they learned that the timestamp on the recording showed that it was made on February 24, that the checks discussed in the recording were signed on the 24th, and that the phone call McCann took was placed on the 24th, it was reasonable for them to conclude that they had been mistaken about the date of the conversation, and the date of the interruption as well. Indeed, Freed herself also had trouble recalling the date she walked into Lindberg's office; she first said it was February 3 and then, after consulting the obituary of her grandfather (who passed away around that time), changed her mind and said the date was February 10. At base, there is nothing remarkable about having difficulty remembering, or remembering incorrectly, the date that an event occurred, and nothing inherently unbelievable about correcting it after consulting other evidence.

Accepting the plaintiffs' affidavits, we turn to the question whether an issue of material fact precluded summary judgment on any of the Wiretap Act claims. The Wiretap Act prohibits intentionally intercepting an oral conversation, 18 U.S.C. § 2511(a), as well as intentionally disclosing or using the contents of such a conversation while having reason to know that it was unlawfully intercepted, 18 U.S.C. § 2511(c), (d); *see Nix v. O'Malley*, 160 F.3d 343, 348 (6th Cir. 1998)[1]. Necessary to all of

---

[1]  Neither party has raised or addressed the issue of whether the federal Wiretap Act requires proof that the interception or

(continued...)

the plaintiffs' claims, then, is an intentional intercep-
tion. But the plaintiffs need not produce direct evidence
of the intentional interception; for often the only way
to prove that a stealthy interception occurred is through
circumstantial evidence. *See DirectTV v. Webb*, 545 F.3d
837, 844 (9th Cir. 2008).

In determining if there was an issue of material fact
on the intentional interception element, the court views
the record in the light most favorable to the non-moving
party, and draws all reasonable inferences in that party's
favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255
(1986); *Antonetti v. Abbott Labs.*, 563 F.3d 587, 591 (7th
Cir. 2009). The court may not weigh the evidence or

---

[1] (...continued)

disclosure occurred in or through the means of interstate
commerce. It seems that it would. *See Doe v. Smith*, 429 F.3d 706,
709 (7th Cir. 2005). If the Lanier dictating system (the system
Lindberg used) transmits data through the internet or tele-
phone lines, for example, or if Freed transmitted the recording
via mail or e-mail to the CEO of the hospital, the Board of
Directors, or anyone else, the interstate commerce require-
ment will have been met. The defendants have not questioned
the use of the Wiretap Act nor its constitutionality. (Note that
if Freed wishes to challenge the constitutionality of the Act,
she would need to alert the district court and arrange for
notice to be given to the Attorney General so that the federal
government may intervene to defend the legislation if it so
desires. See *id.*; 28 U.S.C. § 2403(a); Fed. R. Civ. P. 25(c)). As
neither party has raised the issue before us, we need not
resolve it here, but flag it for resolution on remand.

decide which testimony is more credible. *Anderson*, 477 U.S. at 255; *Kodish v. Oakbrook Terrace Fire Protection Dist.*, 604 F.3d 490, 507 (7th Cir. 2010); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Even if one side's story is more believable, the court must "avoid[ ] the temptation to decide which party's version of the facts is more likely true." *Payne*, 377 F.3d at 770; *Kodish*, 604 F.3d at 507. "As we have said many times, summary judgment cannot be used to resolve swearing contests between litigants." *Payne*, 377 F.3d at 770.

Here, the plaintiffs testified that they did not turn on the dictation machine that recorded their private conversation, but that during their conversation Freed walked in and picked up papers adjacent to the machine, giving her easy access to it. That testimony, when coupled with the facts that the machine was turned on in actual mid-conversation, and that Freed disliked Lindberg's work at the hospital and therefore had reason to discredit him, provides circumstantial evidence that Freed deliberately turned on the recording equipment to capture the unflattering conversation. Freed does not dispute some elements of this story—she recalls entering Lindberg's office while he was speaking to McCann and picking up a stack of forms immediately next to Lindberg's dictation machine. Freed just denies that it happened on the 24th, and denies that she intentionally turned on the dictation machine while she was there. But that leaves us with conflicting testimony on a central issue—in other words, a swearing contest.

Furthermore, the recording does not contradict the plaintiffs' version of the story, and, viewed most fav-

orably to the plaintiffs, provides some support for it. The district court thought the recording favored Freed's story in part because the recording reflects the sound of a door closing when McCann left, but not when Freed would have left. But nothing in the record tells us whether the door could have been closed silently; McCann said she was in a hurry when she left and may have let the door slam, whereas Freed, who was conscious that she was intruding (and, perhaps, that she was being taped) may have closed the door softly to be inconspicuous. Viewed in the light most favorable to the plaintiffs, the absence of sound does not prove Freed correct. In addition, the plaintiffs point out that if Lindberg had accidentally left the machine on, as the defendants suggest, it presumably would have caught their conversation from the beginning. But instead it picks up in the middle of the conversation, so one could infer that it was off but then someone turned it on during the conversation. That is a reasonable inference, and one we must credit on summary judgment.

When reasonable inferences are drawn in the plaintiffs' favor, there is an issue of material fact as to whether Freed intentionally intercepted the plaintiffs' conversation under 18 U.S.C. § 2511(a)(1). That issue of fact precludes summary judgment on the § 2511(a)(1) claim against Freed. It also precludes summary judgment on the § 2511(b) claim against her—that she "disclosed" or "used" the contents of the conversation—because Freed admitted that she distributed the transcript and recording. As for the claim against the hospital based on Freed's conduct, since the hospital

does not argue on appeal that respondeat superior is inapplicable, that claim is available on remand as well.

The claims against the remaining defendants are another matter. Even if Freed illegally made the recording, Leurck and the trustees could be liable only if they had reason to know the recording was made illegally and they used or disclosed the recording. The district court did not address the defendants' arguments on those points, but that does not preclude us from sustaining the judgment based on those arguments. *See Wisconsin Cent., Ltd. v. Shannon*, 539 F.3d 751, 761 (7th Cir. 2008).

To be liable under § 2511(c) or § 2511(d), a defendant must know or have reason to know "'sufficient facts concerning the circumstances of the interception such that the defendant[ ] could, with presumed knowledge of the law, determine that the interception was prohibited in light of [the Wiretap Act].'" *Nix*, 160 F.3d at 349-50 (quoting *Thompson v. Dulaney*, 970 F.2d 744, 749 (10th Cir. 1992)). It is not enough to know that the conversation was intercepted; the defendant must also be able to tell that none of the statutory exceptions apply. *See Williams v. Poulos*, 11 F.3d 271, 284 (1st Cir. 1993); *Thompson*, 970 F.2d at 749. If the defendant does know the interception was illegal, then he is liable if he "uses" or "discloses" to others the contents of the recorded conversation. 18 U.S.C. §§ 2511(c), (d), 2520.

Leurck testified that Freed told him that the recording was made because Lindberg forgot to turn off his dictation machine (again), and if that is all Leurck knew, then he had no reason to think that the recording

violated the statute, which does not cover inadvertent interceptions. The plaintiffs argue that Leurck must have known that the recording was unlawful because Leurck asked two trustees to return the copy of the transcript he had given them. But as the defendants point out, that was after the plaintiffs' counsel sent the hospital a letter accusing Leurck of illegally intercepting the conversation. In light of the letter it is unsurprising that Leurck asked for the transcript back: as a CEO faced with an allegation of illegality, even one he may have thought was unfounded, it was prudent for him to avoid exposing the hospital to further potential liability by ensuring that the transcripts were not disseminated to anyone else. Inferring from this conduct that Leurck must have known the recording was illegal would put him on a razor's edge: risking liability in the form of an inference of guilt if he seeks to contain any damage, and risking additional liability from the transcript's further distribution if he does not. *See, e.g., Beck v. Dobrowski*, 559 F.3d 680, 684 (7th Cir. 2008); *Armstrong v. LaSalle Bank Nat'l Ass'n*, 446 F.3d 728, 733 (7th Cir. 2006); *Flanagan v. Ashcroft*, 316 F.3d 728, 730 (7th Cir. 2003). That Leurck emailed the trustees this request makes it even more far-fetched that he was trying to cover his tracks—a presumably sophisticated CEO would know better than to "cover up" a purportedly illegal recording by creating an electronic trail of the cover-up. On summary judgment we make reasonable inferences in the plaintiffs' favor, but Leurck's request for the transcript is too thin a reed on which to base a reasonable inference that he knew the recording was illegally obtained.

The plaintiffs also seem to suggest in their reply brief that the letter itself gave Leurck a reason to know that the recording was illegal. But the letter provides only a bald allegation and no concrete facts, let alone facts that Leurck was required to believe, to undermine his belief that the recording was made accidentally. *See Nix*, 160 F.3d at 349-50. Indeed, the letter accuses *him* of intercepting the conversation, and since he knew that he did not do so (no one suggests now that he was the interceptor) it is difficult to see how he could have gleaned that one of his employees surreptitiously turned on Lindberg's dictation machine.

As for the trustees, in their brief the plaintiffs identify only one, Mohammed Razvi, who they contend had reason to know the conversation was recorded illegally. They explain that McCann testified that Razvi said to her that the recording was illegal. But, as the defendants point out, it is immaterial if Razvi knew, because the plaintiffs agreed in their statement of undisputed facts that Razvi did not use or disclose the transcript of the conversation. Accordingly, Razvi could not be liable under § 2511(c) or § 2511(d).

The grant of summary judgment for Leurck and the trustees is AFFIRMED. The grant of summary judgment for Freed and the hospital is VACATED, and the case is REMANDED for further proceedings consistent with this opinion.