SARA DARROW, UNITED STATES DISTRICT JUDGE
Before the Court are Defendant BNSF Railway Company's ("BNSF") Motion for Summary Judgment, ECF No. 55, and Motion for Leave to File Reply in Excess of Page Limitation, ECF No. 57. For the reasons that follow, the Motion for Summary Judgment is DENIED in part and GRANTED in part and the Motion for Leave to File Reply in Excess of Page Limitation is GRANTED.
BACKGROUND[1]
BNSF hired Plaintiff Shane Jones on January 26, 1998. Jones was hired as a *1062 "conductor/brakeman/switchman" but became an engineer in 2001, a job he continues to hold today. On December 9, 2014,[2] Jones was "deadheading" from Fort Madison, Iowa to Kansas City, Kansas. Deadheading is a means of transporting employees from location to location on a train already heading in that direction. While riding on locomotive 7162 that day, Jones stood up to use the bathroom at or near milepost 333.2. As he was stretching his back, the train hit a rough patch of track and he fell down several stairs into the locomotive's nose and injured his shoulders. Jones was never warned of any issues with the section of track surrounding milepost 333.2.
BNSF maintains standards for its tracks and locomotives, all of which either match or are more stringent than what regulations promulgated pursuant to the Federal Railroad Safety Act ("FRSA") require. At the time of Jones's injury, BNSF required visual inspection of the section of track where the injury occurred four times a week. Track inspectors inspected that section on November 23, 24, 25, 26, and 28, as well as on December 1, 2, 3, 4, 5, and 8. Defendant provided records of its inspections from December 2013 to December 2014. See PARS Information Report for Mileposts 327 to 337 from December 9, 2013 to December 9, 2014, Mot. Summ. J. Ex. I, ECF Nos. 55-34-55-37. Although it claims these records show that no defects were found during those inspections, whether the records support that is not clear. It is clear, however, that at least two of the records indicate that BNSF got reports of rough track on the portion of track that it inspected. Id. at 16, ECF No. 55-35 (noting that on November 23 the maintenance desk called to report rough track); id. at 17 (noting that on December 3 the record maker "did not get headed to rough track call until 0230").
In addition to requiring visual inspections, BNSF uses manned and unmanned geometry cars to inspect its tracks. Geometry cars use inclinometers, accelerometers, and lasers to measure track position. Measurements of the track's gauge, surface, and cross-level are fed into a computer program. BNSF has programmed its geometry cars to detect defects that, at a minimum, exceed FRSA standards. In some cases, the cars are programmed to more stringent standards mandated by BNSF. If the geometry cars detect no deviation from their programmed standards, BNSF considers the track safe for cars to travel on at full speed. If the car does detect a deviation, the defect is reported in real time. The report includes information about the defect as well as other details about the track. Sometimes defects lead to a track being "slow ordered," which reduces the track's speed limit so that trains can safely travel along the track. Before a slow order is removed, the cause must be addressed or repaired. Even if a deviation is not reported, the track may still need repairs. Geometry *1063 cars are also equipped with Vehicle Track Interaction Exception Inspections ("VTI"), designed to measure surface accelerations. In essence, the VTI measures the acceleration that people riding in the locomotive would feel. The section of track including milepost 333.2 was inspected by geometry car on November 19, 2014. The report indicated no deviation from FRSA standards and the VTI report showed no acceleration beyond a threshold value.
BNSF also records reports of rough track. If there are two or more reports of rough track within a 0.3 mile stretch of track over a period of 30 days, the second report generates a repeat Rough Track Report. Once a repeat Rough Track Report is generated, the affected section of track is automatically slow ordered and cars on the track cannot travel faster than 25 miles per hour. A management level employee then must assess the section of track to determine whether the issue has been resolved. Milepost 333 was reported as rough on October 16 and milepost 333.2 was reported as rough on October 27. Because these were within 30 days, a repeat Rough Track Report was generated and the area was slow ordered. A repeat Rough Track Report was generated on December 9 for a nearby section because there were reports of rough track at milepost 333.6 on November 23 and at milepost 333.7 on December 9. When the track was inspected in response to the November 23 report, no deviations from BNSF standards were found. Another repeat Rough Track Report was generated on December 9 because of reports of rough track at milepost 332.3 on November 28 and at milepost 332.6 on December 9. Bill Moore, a BNSF track inspector, inspected milepost 332.3 in response to the November 28 report. Although BNSF claims that Moore found nothing wrong with the track, see Moore Dep. 42:20-25, Mot. Summ. J. Ex. E, ECF No. 55-29, Moore said that his report meant that the track "was definitely good at [that] spot for track speed," id. 43:2-6, and that he did not mean that no work was done on the track, id. 44:4-7. Because of the two repeat Rough Track Reports on December 9, the track around those mileposts was inspected and two mud holes-spots in the track where ballasts are plugged and no longer drain, resulting in mud being pumped to the surface-were discovered. One mud hole caused a deviation of one and seven-eighths inches and the other a deviation of one and three-eighths inches. FRSA, and BNSF, standards required a slow order to be placed only where the deviation was two inches or more.
Jones asserts that there were long-term problems with the stretch of track between mileposts 332 and 334. For instance, that section of track was slow ordered 120 times in 2014, which is a larger than usual number of slow orders. Additionally, Moore was called to inspect that section of track often because it was degraded and muddy. Plaintiff asserts that BNSF had been working toward a permanent fix for that section of track, but BNSF counters that it merely intended to permanently fix the mud holes identified in December 2014. Furthermore, Doug Fotenos, another track inspector, recommended that milepost 332 be included on BNSF's 2014 capital plan due to the repeated rough track reports. He wanted the track to be undercut, which is more permanent than other types of repair. Milepost 332 was also on BNSF's list to receive funding for major repairs in November 2014.
Jones filed suit in this Court on December 3, 2015. Compl., ECF No. 1. He alleged violations under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§ 51 - 60, and the Locomotive Inspection Act, ("LIA"), 49 U.S.C. § 20701. In his FELA claim, Jones alleged:
*1064 a) Defendant failed to provide plaintiff with a reasonably safe place to work in that defendant's track and adjacent structures were not properly maintained, thereby creating "drop-outs" or "holes" that pose a danger to trains and crews; or
b) Defendant failed to provide reasonably safe conditions for work in that defendant failed to properly equip its trains with appropriate handholds; or
c) Defendant failed to provide reasonably safe methods of work in that defendant, in an attempt to save money, put plaintiff and other crews on trains deadheading instead of providing them with reliable van transportation; or
d) Defendant failed to provide reasonably safe equipment in that the locomotive engines were not equipped to withstand the dropouts or soft spots of which defendant was aware; or
e) Defendant failed to properly inspect and maintain its track; or
f) Defendant failed to warn of an unsafe condition on its track; or
g) Defendant failed to properly inspect and maintain its locomotive engines; or
h) Defendant failed to warn plaintiff of dangers known to defendant, or that with reasonable inspection, should have been known to defendant; or
i) Defendant violated 49 CFR [sic] § 213 et seq. and 49 CFR [sic] § 229.7 and 229.45 et seq and defendant's violations constitute negligence per se; or
j) Defendant was negligent by the doctrine of Res Ipsa Loquitor [sic].
Compl. 1-4. In his LIA claim, Jones alleged that the locomotive he was riding in lacked adequate safety devices and that the track the locomotive was riding upon was not in compliance with federally mandated minimum track standards. Id. at 4-7. BNSF moved for summary judgment on January 31, 2017. It moved for leave to file a reply in excess of the page limitation in the Local Rules on March 3.
DISCUSSION
I. Motion for Leave to File Reply Brief in Excess of Page Limitations
BNSF requested leave to file a reply in excess of the five-page limitation set out in Local Rule 7.1 (D)(5). BNSF asserts that it needs four extra pages of argument to reply to a complex legal argument raised in Jones's response-the application of POM Wonderful LLC v. Coca-Cola Co. , --- U.S. ----, 134 S.Ct. 2228, 189 L.Ed.2d 141 (2014), to whether FRSA precludes Jones's claims brought under FELA. Jones opposed the motion, arguing that BNSF "consciously omitted the POM Wonderful decision from its 27-page Motion for Summary Judgment." Resp. Mot. Leave File Reply Excess Page Limitation 1-2, ECF No. 58. Jones requested leave to file a short sur-reply if the motion was granted. Id. at 4. Although the Court questions BNSF's use of the practice in this case,[3] it finds that Jones will not be prejudiced by BNSF's extra pages of argument and that there is no need for a reply. The Motion for Leave to File Reply in Excess of Page Limitation, ECF No. 57, is GRANTED.
*1065 II. Motion for Summary Judgment
a. Legal Standard
Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial-that is, whether there is sufficient evidence favoring the non-moving party for a jury to return a verdict in its favor. Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ; Patel v. Allstate Ins. Co. , 105 F.3d 365, 370 (7th Cir. 1997). The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. McCann v. Iroquois Mem'l Hosp. , 622 F.3d 745, 752 (7th Cir. 2010) (citing Anderson , 477 U.S. at 255, 106 S.Ct. 2505 ). "A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole." Pipitone v. United States , 180 F.3d 859, 861 (7th Cir. 1999) (quoting Roger v. Yellow Freight Sys., Inc. , 21 F.3d 146, 149 (7th Cir. 1994) ).
b. Analysis
BNSF seeks judgment against Jones on both his FELA and his LIA claims. Jones does not oppose BNSF's motion with respect to his LIA claims. Resp. Mot. Summ. J. 2 n. 1, ECF No. 56. Jones also failed to respond to the portions of BNSF's motion seeking summary judgment on his claims related to inspections of the locomotive Jones was riding in when injured, see Mot. Summ. J. 23-24, his res ipsa loquitur claim, see id. at 24-25, and his claim that deadheading on a train was negligent, see id. at 25-26. In his response to BNSF's summary judgment motion, Jones describes his FELA claims as claims that BNSF "failed to properly maintain the track in a safe condition, failed to warn of the unsafe condition of the track, and/or failed to properly inspect the track to identify areas needing repair." Resp. Mot. Summ. J. 1. Failure to respond to a motion for summary judgment is an admission of the facts upon which the moving party relied. see Gerhartz v. Richert , 779 F.3d 682, 685 (7th Cir. 2015). The Court can grant summary judgment on an issue "if the motion and supporting materials-including the facts considered undisputed-show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3). In light of Jones's concession and the undisputed facts-and because Jones has not set forth any facts to support these claims-BNSF is entitled to judgment on the LIA claims, the res ipsa loquitur claim, and any other claims relating to deadheading or conditions on the locomotive itself.
As to the FELA claims, BNSF argues that it is entitled to summary judgment because all of Jones's FELA claims are precluded by FRSA. BNSF argues that it was in compliance with all FRSA regulations relevant to Jones's claims-track maintenance and track inspection-and Jones does not seem to disagree. See, e.g. , Resp. Mot. Summ. J. 4 (not disputing that FRSA regulations required track inspections twice per week and that the track where Jones was injured was inspected more than twice a week before his injury). BNSF argues that Jones's claims must fail because of this fact. Mot. Summ. J. 11-19. BNSF argues that FRSA precludes negligence claims brought under FELA to the extent that FRSA regulations substantially subsume the subject matter of the negligence claim, so long as the regulations are complied with. Id. at 11-12. Jones argues that FELA claims are not precluded by FRSA and that it has provided sufficient *1066 evidence that BNSF was negligent. Resp. Mot. Summ. J. 14-23, 26-27. Perhaps in the alternative, Jones also argues that the FRSA regulations BNSF points to do not subsume the field of track inspection or maintenance, and thus that even if FRSA precludes some FELA claims, his claims are not precluded. Id. at 23-26.
i. FELA Claims
If Jones's FELA claims are not precluded, BNSF's motion must be denied because it has not disputed the evidence set forth by Jones supporting a finding of negligence beyond stating that it was in compliance with FRSA regulations. Under FELA, railroads "shall be liable in damages to any person suffering injury while he is employed" by the railroad "for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of [the railroad], or by reason of any defect or insufficiency, due to its negligence," in its tracks or equipment. 45 U.S.C. § 51. A plaintiff "must offer evidence proving the common law elements of negligence, including duty, breach, foreseeability, and causation." Williams v. Nat'l R.R. Passenger Corp. , 161 F.3d 1059, 1062 (7th Cir. 1998). Railroads are held to a prudent-person standard of care, id. , but a plaintiff need only prove that negligence played "even the slightest" part in producing his injury to get to a jury, id. at 1061 (quoting Consol. Rail Corp. v. Gottshall , 512 U.S. 532, 543, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994) ).
Jones argues that there is evidence to prove that BNSF could have reasonably foreseen that injury may happen to an employee when riding over the section of track between milepost 332 and 334. Resp. Mot. Summ. J. 26-27. That section of track had been listed on the slow order log 120 times in 2014. An inspector went out to the area often to inspect the degraded and muddy track. There were numerous reports of rough track on that section in the weeks preceding Jones's injury. Despite BNSF's inspections, the reports kept occurring, indicating that the issues were not repaired. And BNSF itself had identified that stretch of track as needing major repairs. Jones was never warned about any of these issues. BNSF's response is that it complied with FRSA regulations. Reply Mot. Summ. J. 17-18, Mot. Leave File Reply Excess Page Limitation Ex. A, ECF No. 57-1. Jones was injured as the locomotive he was riding in hit a rough surface within this section of track. When the train hit the rough track, it caused Jones to fall down several stairs and injure his shoulders. If compliance with FRSA regulations does not immunize BNSF from liability, there is enough evidence from which a jury could find that BNSF was negligent in maintaining and inspecting the track, and in failing to warn Jones about the danger of the track, and that its negligence contributed to Jones's injury.
ii. FELA Preclusion
BNSF argues that Waymire v. Norfolk and Western Railway Company , 218 F.3d 773 (7th Cir. 2000), controls this case. In Waymire , the Seventh Circuit found "that in order to uphold FRSA's goal of uniformity." it had to preclude FELA negligence claims of a train traveling at unsafe speeds and of failure to install adequate warning devices where FRSA regulations set a speed limit higher than the speed the train was traveling and prescribed standards for the adequacy of warning devices. Id. at 776-77. In essence, the court held that where FRSA "regulations cover the subject matter" of a FELA negligence claim, the claims are superseded. Id. In coming to this conclusion, the Seventh Circuit noted that the issue was "the interaction of two federal statutes" and whether one precluded actions under the other. Id. at 775. But the court relied on two United States *1067 Supreme Court cases finding preemption of state law negligence claims for unsafe train speeds and inadequate warning devices. Id. at 775-77. The court held that "[t]o treat cases brought under federal law differently from cases brought under state law would defeat FRSA's goal of uniformity." Id. at 777. The Fifth and Sixth Circuits relied on Waymire to hold that FRSA regulations preclude FELA claims to the same extent they preempt state law claims. see Nickels v. Grand Trunk W. R.R., Inc. , 560 F.3d 426, 429-30 (6th Cir. 2009) ; Lane v. R.A. Sims, Jr., Inc. , 241 F.3d 439, 443 (5th Cir. 2001).
Jones argues that this case is instead controlled by POM Wonderful. POM Wonderful , 134 S.Ct. at 2233, which was decided in 2014, involved the intersection of two federal statutes as well-the Food, Drug, and Cosmetic Act ("FDCA") and the Lanham Act. The Court held that determining how to give effect to both statutes was a question of statutory interpretation. Id. at 2236. The Court explained that federal preclusion was a different issue than preemption of state laws, but noted that preemption "principles are instructive insofar as they are designed to assess the interaction of laws that bear on the same subject." Id.
In determining whether actions for unfair competition under the Lanham Act were precluded by the FDCA and its regulations, the Court considered the text, structure, purpose, and enforcement mechanism of each statute. As to the text, the Court noted that preclusion of Lanham Act claims was not required by the text of the FDCA. Id. at 2237. And because the two statutes had co-existed for seventy years, the absence of a provision explicitly precluding other federal regulation was "of special significance." Id. Furthermore, using the principle of expressio unius est exclusio alterius , the Court noted that the FDCA's explicit preemption of state law requirements for food and beverage labeling "indicated [Congress] did not intend the FDCA to preclude requirements arising from other sources." Id. at 2238. As to structure, the Court held that the two statutes complement each other because each has its own scope and purpose, imposes different requirements, and has a different enforcement mechanism. Id. at 2238-39. The FDCA protects public health and safety, whereas the Lanham Act protects commercial interests. Id. at 2238. The Food and Drug Administration enforces the FDCA and its regulations, whereas Lanham Act suits can be brought by private parties. Id. Working together, the statutes "enhance the protection of competitors and consumers." Id. at 2239. The Court held that "it would show disregard for the congressional design to hold that Congress nonetheless intended one federal statute to preclude the operation of the other." Id. at 2238.
The Court also considered and rejected Coca-Cola's argument that allowing Lanham Act claims would undermine the FDCA's goal of achieving national uniformity. The Court explained that the disuniformity that can arise from enforcement of a federal statute through federal courts "is quite different from the disuniformity that would arise from the multitude of state laws" that the FDCA's preemption provision forbids. Id. at 2239-40. It pointed out that Congress "not infrequently permits a certain amount of variability by authorizing a federal cause of action even in areas of law where national uniformity is important." Id. at 2240.
BNSF argues that "no reasonable argument exists that the holding in POM Wonderful was intended to ever touch any other federal regulations aside from those directly implicated by the facts of that case." Reply Mot. Summ. J. 12. But, to the *1068 contrary, numerous courts have explained that under the principles laid out by the Supreme Court in POM Wonderful , FRSA and its regulations do not preclude FELA claims. See, e.g. , Oliveros v. BNSF Ry. Co. , 8:14CV135, 2016 WL 7475663, at *1 (D. Neb. Mar. 28, 2016) ; Meachen v. Ia. Pac. Holdings, LLC , No. 13-CV-11359, 2016 WL 7826660, at *4 (D. Mass. Feb. 10, 2016) ; Hananburgh v. Metro-North Commuter R.R. , No. 13-CV-2799, 2015 WL 1267145, at *4-5 (S.D.N.Y. Mar. 18, 2015) ; Bratton v. Kansas City S. Ry. Co. , No. 13-3016, 2015 WL 789127, at *2 (W.D. La. Feb. 24, 2015) ; Henderson v. Nat'l R.R. Passenger Corp. , 87 F.Supp.3d 610, 615-20 (S.D.N.Y. 2015) ; Madden v. Anton Antonov & AV Transp., Inc. , 156 F.Supp.3d 1011, 1019-22 (D. Neb. 2015).[4] With the exception of Bratton , however, these district courts are located in circuits without controlling circuit precedent like Waymire. Thus, this Court undertakes its analysis carefully in determining whether the holding in Waymire was disturbed by the principles laid out in POM Wonderful.
First, unlike in POM Wonderful , the Seventh Circuit in Waymire did not consider the text of the two statutes. FRSA contains a preemption provision, under which a "State may adopt or continue in force a law, regulation, or order related to railroad safety and security until the Secretary of Transportation ... prescribes a regulation or issues an order covering the subject matter of the State requirement." 49 U.S.C. § 20106(a)(2). Under the expressio unius est exclusio alterius canon, that Congress chose to specifically preempt state laws indicates it did not intend to preclude other regulation. see POM Wonderful , 134 S.Ct. at 2238. Furthermore, like the FDCA and the Lanham Act, FRSA and FELA have co-existed for 47 years. see Gottshall , 512 U.S. at 542, 114 S.Ct. 2396 (noting that FELA was enacted in 1908); Meachen , 2016 WL 7826660, at *3 (noting that FRSA was enacted in 1970). Although FRSA has been amended in that time, no express limitation of FELA claims has been added to the statute.
Second, unlike in POM Wonderful , the Seventh Circuit did not address whether the structure, purpose, or enforcement mechanisms of the statutes were complementary. When FELA was enacted, Congress's "attention was focused primarily upon injuries and death resulting from accidents on interstate railroads." Gottshall , 512 U.S. at 542, 114 S.Ct. 2396 (quoting Urie v. Thompson , 337 U.S. 163, 181, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949) ). Congress's intent in enacting FELA was "to provide liberal recovery for injured workers." Kernan v. Am. Dredging Co. , 355 U.S. 426, 432, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958). Congress eliminated various common-law tort defenses that favored railroads and "crafted a federal remedy that shifted part of the 'human overhead' of doing business from employees to their employers." Gottshall , 512 U.S. at 542, 114 S.Ct. 2396 (quoting Tiller v. Atlantic Coast Line R. Co. , 318 U.S. 54, 59, 63 S.Ct. 444, 87 L.Ed. 610 (1943) ). FRSA was enacted *1069 "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. Clearly there is a greater overlap between the purposes of FRSA and FELA than the FDCA and the Lanham Act, but FELA and FRSA approach railroad safety in different ways. see Madden , 156 F.Supp.3d at 1021. And the two statutes can work in tandem to create safer environments for both employees and the public. see Henderson , 87 F.Supp.3d at 616 ; contra Schendel v. Duluth Missabe & Iron Range Ry. Co. , 69DU-CV-13-2319, 2014 WL 5365131, at *4, 2014 Minn. Dist. LEXIS 8, at *8 (Minn. Dist. Ct. Sept. 29, 2014) (finding that the purpose of both FELA and FRSA is railroad safety). Additionally, disallowing FELA claims for negligence when FRSA regulations substantially subsume the subject matter of the claims would leave an injured worker like Jones automatically without a remedy. In light of FELA's purpose of providing a remedy for injured workers and its liberal construction, courts should hesitate before creating a limitation on FELA by inference. see Urie , 337 U.S. at 190, 69 S.Ct. 1018.
Furthermore, the enforcement mechanisms of FELA and FRSA complement each other. FELA creates a cause of action for injured railroad workers. 45 U.S.C § 51. FRSA gives the Secretary of Transportation the authority to "prescribe regulations and issue orders for every area of railroad safety." 49 U.S.C. § 20103(a). The Secretary of Transportation has delegated authority to promulgate and enforce such regulations to the Federal Railroad Administration. Mich. S. R.R. Co. v. City of Kendallville , 251 F.3d 1152, 1154 (7th Cir. 2001). Enforcement powers are given primarily to the Secretary of Transportation, but in some cases to the Attorney General or to the states, 49 U.S.C. §§ 20111 -13. Thus, like in POM Wonderful , the statutes' enforcement mechanisms are complementary and allowing FELA claims "takes advantage of synergies among multiple methods of regulation." see POM Wonderful , 134 S.Ct. at 2239 ; contra Schendel , 2014 WL 5365131, at *4, 2014 Minn. Dist. LEXIS 8, at *10 (finding that the statutes work at cross-purposes rather than in a complementary manner).
Lastly, the Seventh Circuit in Waymire , 218 F.3d at 777, relied on the idea that "[t]o treat cases brought under federal law differently from cases brought under state law would defeat FRSA's goal of uniformity." But this same argument made by Coca-Cola was rejected in POM Wonderful , 134 S.Ct. at 2239-40.[5] Although Coca-Cola argued that the FDCA impliedly had a goal of national uniformity and FRSA explicitly has that goal, see 49 U.S.C. § 20106(a), the FRSA provision should be read in context and "with a view to [its] place in the overall statutory scheme," Davis v. Mich. Dep't of Treasury , 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989). The FRSA provision about national uniformity is found within a section on preemption of state laws. This indicates that national uniformity is the goal of the preemption provision, rather than the overall purpose of FRSA. see Noice v. BNSF Ry. Co. , 383 P.3d 761, 770 (N.M. 2016) (" Waymire narrowly emphasizes the purpose of FRSA's pre-emption provision ...."). Regardless, it is not clear that the Supreme Court's reasoning would have changed had the FDCA explicitly stated a goal of national uniformity. see POM Wonderful , 134 S.Ct. at 2240 ("Congress not infrequently permits a certain amount of *1070 variability by authorizing a federal cause of action even in areas where national uniformity is important."); Henderson , 87 F.Supp.3d at 621 ("[T]his relatively minor distinction does not warrant reaching a different result.").
In POM Wonderful , 134 S.Ct. at 2239-40, the Supreme Court explained that disuniformity from a system of varying state laws is "quite different" from the "variation in outcome" that may result from "application of a federal statute ... by judges and juries in courts throughout the country." Thus, to the extent that the Waymire decision is premised on the idea that allowing federal claims about railroad safety undermines national uniformity, POM Wonderful has displaced Waymire.
Applying the principles set out in POM Wonderful ,[6] the Court concludes that FRSA and its regulations do not preclude FELA claims, even where the regulations cover the same subject matter as the claimed negligence. FRSA regulations are still relevant as evidence that a railroad met its standard of care, but "[c]ompliance with a legislative enactment or an administrative regulation does not prevent a finding of negligence where a reasonable man would take additional precautions." Restatement (Second) of Torts § 288C (1965) ; see Henderson , 87 F.Supp.3d at 617.
CONCLUSION
Accordingly, BNSF's Motion for Summary Judgment, ECF No. 55, is DENIED in part and GRANTED in part. The motion is DENIED as to the FELA claims for track maintenance, track inspection, and failure to warn of an unsafe condition. The motion is GRANTED as to the LIA claims, the res ipsa loquitur claim, and all claims relating to deadheading or conditions on the locomotive itself. BNSF's Motion for Leave to File Reply in Excess of Page Limitation, ECF No. 57, is GRANTED. The pretrial order is due November 13, 2017, the final pretrial conference is set for 1:30 PM on December 1, 2017, and the trial is set for 9:00 AM on January 22, 2018.

At summary judgment, a court "constru[es] the record in the light most favorable to the nonmovant and avoid[s] the temptation to decide which party's version of the facts is more likely true." Payne v. Pauley , 337 F.3d 767, 770 (7th Cir. 2003). The facts related here are, unless otherwise noted, taken from BNSF's statement of undisputed material facts, Mot. Summ. J. 3-10; from Jones's disputed material and immaterial facts and additional material facts, Resp. Mot. Summ. J. 3-13, ECF No. 56; from BNSF's reply thereto, Reply Mot. Summ. J. 1-10, Mot. Leave File Reply Excess Page Limitation Ex. A, ECF No. 57-1; and from the exhibits to the motions. Where the parties disagree about the facts, the Court views the evidence in the light most favorable to Jones, the non-moving party, and draws all reasonable inferences in his favor. McCann v. Iroquois Mem'l Hosp. , 622 F.3d 745, 752 (7th Cir. 2010) (citing Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ).

Although in the complaint, Jones alleges that he was injured on December 7, 2014, see Compl. ¶ 5, ECF No. 1, in the summary judgment briefing the parties do not dispute that the injury occurred on December 9, 2014, see Mot. Summ. J. 1; Resp. Mot. Summ. J. 1.

As Jones points out in his response to the motion for summary judgment, BNSF was a party in several recent cases applying POM Wonderful to this precise issue. Resp. Mot. Summ. J. 19.

At least one state court has held that POM Wonderful does not compel the conclusion that FELA claims are not precluded by FRSA. See Schendel v. Duluth Missabe & Iron Range Ry. Co. , 69DU-CV-13-2319, 2014 WL 5365131, at *4, 2014 Minn. Dist. LEXIS 8, at *10 (Minn. Dist. Ct. Sept. 29, 2014). A magistrate judge in the Northern District of Ohio has also held that even after POM Wonderful , LIA claims are precluded by FRSA. see Wheeler v. CSX Transp., Inc. , No. 3:14 CV 2689, 2017 WL 3116701, at *5-13 (N.D. Ohio July 21, 2017). The court, however, noted that LIA preemption of state law claims is much broader than FRSA preemption and that unlike FRSA, there is no express preemption provision in the LIA. Id. at *11.

Notably, Coca-Cola relied on Waymire in arguing that national uniformity required precluding Lanham Act claims. Brief for Respondent at 25-26, POM Wonderful LLC v. Coca-Cola Co. , --- U.S. ----, 134 S.Ct. 2228, 189 L.Ed.2d 141 (2014).

The Seventh Circuit has applied at least some of the principles elucidated in POM Wonderful to other statutes. see Lewis v. Epic Sys. Corp. , 823 F.3d 1147, 1157 (7th Cir. 2016), cert. granted , --- U.S. ----, 137 S.Ct. 809, 196 L.Ed.2d 595 (2017) (using POM Wonderful principles in a case involving the National Labor Relations Act and the Federal Arbitration Act).