# Illinois Official Reports

## Appellate Court

Myrick v. Union Pacific R.R. Co., 2017 IL App (1st) 161023

| | |
|---|---|
| Appellate Court Caption | CHEVAS MYRICK, Plaintiff-Appellant, v. UNION PACIFIC RAILROAD COMPANY and THE BELT RAILWAY COMPANY OF CHICAGO, Defendants-Appellees. |
| District & No. | First District, Second Division<br>Docket No. 1-16-1023 |
| Rule 23 order filed<br>Rule 23 order withdrawn<br>Opinion filed | June 30, 2017<br><br>July 19, 2017<br>July 25, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-L-3174; the Hon. Edward Washington II, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Hoey & Farina, P.C., of Chicago (Matthew F. Liebert, Richard A. Haydu, and Steven P. Garmisa, of counsel), for appellant.<br><br>Elizabeth A. Graham and Robert J. Gibbons, Corporation Counsel, of Chicago, for appellees. |

| Panel | JUSTICE PIERCE delivered the judgment of the court, with opinion. Presiding Justice Hyman and Justice Mason concurred in the judgment and opinion. |

**OPINION**

¶ 1     Plaintiff, an employee of Union Pacific Railroad Company (Union Pacific), sustained injuries to his leg while he was assigned to work in a rail yard operated by the Belt Railway Company of Chicago (Belt Railway). Plaintiff alleged that he was dropped off by a Belt Railway employee at an unlit, hazardous location, and that while he was walking from the drop off location to his destination, he stepped in a snow-covered hole. Plaintiff's first amended complaint asserted claims against Union Pacific and Belt Railway under the Federal Employers' Liability Act (FELA) (45 U.S.C. § 51 (2012)) and a negligence claim against Belt Railway.[1] Lawanda Myrick, Chevas Myrick's wife, asserted a loss of consortium claim against Belt Railway.[2] The circuit court granted defendants' pretrial motion *in limine* to bar plaintiff from introducing evidence that there were safer alternative locations where he could have been dropped off. Plaintiff made an offer of proof regarding the alternative drop off locations. The jury returned a verdict in favor of defendants. Plaintiff's motion for a new trial was denied, and plaintiff appeals. For the following reasons, we reverse and remand for a new trial.

¶ 2                                          BACKGROUND

¶ 3     Chevas Myrick, a freight conductor, filed a complaint, seeking damages for injuries he allegedly sustained while working for Union Pacific at a facility operated by Belt Railway (collectively, defendants). In count I of Myrick's first amended complaint, he asserted a claim under the FELA against Union Pacific. He alleged that on March 7, 2013, while performing his duties as a "trainman/conductor," he was sent by Union Pacific to a Belt Railway facility to build a train and prepare it for departure. When Myrick finished building the train, Belt Railway transported him to "an area between rail tracks in the rail yard which required [him] to walk across a number of railroad tracks to reach [the] locomotive" so that it could be moved out of Belt Railway's yard. Myrick alleged that the ground was uneven and covered by 3 to 18 inches of snow, and that while he was walking from the drop off location to the locomotive, he stepped "into a hole under the snow in the walkway between the tracks," resulting in injuries. The complaint alleged that Union Pacific had a duty "to use ordinary care in furnishing [Myrick] with a safe place to work, even when required to go into property owned and operated by third parties." Myrick alleged, in relevant part, that Union Pacific was negligent by failing to have him "properly and safely transported to the engine," and "[o]therwise, fail[ing] to provide [Myrick] with a reasonably safe place to work."

¶ 4     Count II asserted a FELA claim against Belt Railway, alleging that at the time he was injured, Myrick "was acting as a borrowed servant" or alternatively, "acting for two masters."

_____
[1]Neither party addresses whether Myrick's common law negligence claim is preempted by FELA.
[2]This claim is not at issue in this appeal, and Lawanda is not a party to this appeal.

Count II alleged that Myrick was dropped off "several hundred feet" from the train's engine and that while walking across the rail tracks, he stepped into a hole covered by snow, causing him injuries. He alleged that Belt Railway had a duty to "provide [Myrick] with a reasonably safe place to work, to provide reasonably safe conditions in which to work, to exercise ordinary care to avoid placing [Myrick] in danger and to exercise ordinary care on its property in operations for the safety of [Myrick]." He alleged, in relevant part, that Belt Railway was negligent for "[f]ail[ing] to deposit [Myrick] at a safe location adjacent to the locomotive."

¶ 5    Count III asserted a negligence claim against Belt Railway, alleging that instead of driving Myrick "onto a vehicular road *** which would have deposited [Myrick] directly adjacent to the locomotive engine, as was the customary procedure, [the] trainmaster deposited [Myrick] in an area between rail tracks in the rail yard which required [Myrick] to walk across a number of railroad tracks to reach the train." Myrick alleged that Belt Railway had a duty to use ordinary care for his safety, and was negligent, in relevant part, for "[f]ailing to transport [him] to a safe location to access the engine," and "provide [him] with a reasonably safe place to work."

¶ 6    Defendants answered the first amended complaint, and the case proceeded to a jury trial. Prior to trial, defendants moved *in limine* to bar "the introduction of any evidence that [Myrick] should have been dropped off in a 'better' or 'safer' location." Defendants argued that "railroad employers are not required to furnish their employees with the latest, best, and most perfect equipment or methods with which to work," and that the relevant inquiry under FELA is whether the railroad "exercised reasonable care in fulfilling its duty to provide a reasonably safe workplace and reasonably safe methods, not whether the procedures could have been made 'safer.' " Defendants asserted that "[o]nly if plaintiff can present evidence establishing that the location where he fell was not reasonably safe should he prevail."

¶ 7    In his written response to defendants' motion *in limine*, Myrick argued that defendants had a duty to use ordinary care to provide him with a reasonably safe place to work. He argued that his testimony would show that he was "customarily driven on different path [*sic*] outside the yard on a roadway" and that March 7, 2013, was the first time that defendants had dropped him off in the area where they did. He argued that defendants "ignored" their "normal procedure" in favor of "the less safer [*sic*] alternative."

¶ 8    After oral argument, the circuit court found that "the focus should be on where the accident happened," since neither FELA nor a common law negligence claim requires a defendant to explain "why they didn't drop him off someplace else." The circuit court observed that Myrick would have "ample opportunity" to show how defendants' decision as to where Myrick was dropped off was negligent and that it "was not a good place to drop him off." The circuit court explained that even if the location where Myrick was dropped off was the only place that defendants could have dropped him off, defendants still had a duty to make it safe. The circuit court granted defendants' motion *in limine*.

¶ 9    At trial, Myrick testified that one of his regular job responsibilities as a Union Pacific freight conductor was to perform "transfer jobs." In a transfer job, Union Pacific transports its employees to another railroad's switching facility. There, the Union Pacific employees assemble a train under the supervision and control of the other railroad's managers, and then move the train to Union Pacific's facilities. Myrick had done transfer jobs at various times over his 15-year employment, and it was a regular assignment for several months prior to the accident. On March 6, 2013, Myrick began work at around 9 p.m. at Union Pacific's facility in

Northlake. Union Pacific assigned Myrick to do a transfer job at Belt Railway's Chicago facility. He was taken by a "cab" to the Belt Railway facility. The Union Pacific crew assembled the Union Pacific train on the "main line track." Myrick requested the Belt Railway yardmaster to call for a cab to take Myrick to the head of the train. However, after a 20 to 30 minute wait, Belt Railway told Myrick that no cabs were available and that he would have to walk to the locomotive.

¶ 10   While Myrick was walking, Mark Labbe, the Belt Railway trainmaster, picked Myrick up in a Jeep, drove him closer to the head of the train where he dropped him off about 25 railcars from the locomotive. Labbe selected the drop off location. Myrick stated that it was dark outside and that the only light in the area was from the lantern that he had with him. The snow was about two feet deep. Myrick testified that it was not an area where he would normally walk and that the ground was uneven. After crossing two sets of tracks, Myrick stepped on the shoulder of the track and his foot went into a snow-covered trench injuring his leg.

¶ 11   Labbe testified that it was not unusual for him to give crews rides in the yard. When he picked Myrick up, they were about a half mile from the locomotive. There was snow on the ground, and the road Labbe was driving on had been partially plowed, however, the area where he dropped Myrick off had not been plowed. Labbe testified that he dropped off daytime crews "a few times" during that winter at the same location where he dropped off Myrick, that it was "the most efficient," and "it was the most common sense area to drop him off at."

¶ 12   Myrick's coworker, Wiley Brown, had never seen Belt Railway drop a worker where Labbe dropped Myrick that day, and on previous occasions when the locomotive was in a similar location as the date of the accident, Belt Railway would drop the conductor under the Harlem Avenue bridge on a road adjacent to the tracks.

¶ 13   Belt Railway's track supervisor in charge of snow removal, Robert Ward, testified that the area where Myrick was dropped off had been "left to go natural," and that Belt Railway did not plow that area because transportation employees like Myrick did not typically work there. Where the injury occurred, the tracks were sloped because they were main line tracks, which are different from yard tracks, where transportation employees typically work, which are flat.

¶ 14   Myrick made the following offer of proof regarding alternative drop off locations:

"Q. Now, the area that you were dropped off, was that the normal area you had been dropped off before?

A. No.

Q. Had you ever been dropped off there before?

A. No.

Q. Were there different areas where you had been dropped off when your train was in the area where it was on the night in question?

A. Yes.

Q. I'm showing you Plaintiff's Exhibit No. 5, a statement prepared by your foreman in training, Mr. [Wiley] Brown. It indicates that you told him that they should have took [*sic*] you to Argo to be dropped off. Do you see that?

A. That's correct.

Q. Where is Argo in relationship to where your engines were?

- 4 -

A. Argo is on the main line where our train leaves whatever designated area it's in. They would put me in a cab or a manager will take me to Argo, which is at Proviso East, and the signal is there. Once the dispatcher give the [*sic*] train the signal, the train will pull up, I get out the cab [*sic*] and I board the train. Which is on level ground. It's like a bus terminal.

Q. And how far does the cab drop you off from the train that comes to get you?

A. It will be about maybe 3, 4 miles.

Q. When the train drops you off at Argo, how far is that from the tracks?

A. It's probably a few feet.

Q. Has that been done before in the winter?

A. All the time.

Q. Does that have uneven ground?

A. No.

Q. Is it well lit?

A. Well, if it have uneven [*sic*] ground, it's when I'm boarding but I'm on the shoulder of the track.

Q. Does that require you to walk across any surfaces—

A. Not at all."

¶ 15    Myrick stated that there were two alternative areas that were routinely used for a drop off when the train was located where it was on the day of the accident: the Argo site or a roadway adjacent to the tracks located under the Harlem Avenue bridge. Typically, either Belt Railway would call a cab or one of his supervisors would take him to the Argo site. Once he was at the Argo site, the Belt Railway dispatcher would signal the train to proceed, and when it approached Myrick, he would leave the cab and board the train from level ground "like a bus terminal" only a few feet from the cab. If Belt Railway had called for a cab, the driver would have taken him to Argo because, "[t]hey know the rules. They're not going to put me in a situation because they don't want to put themselves in a situation." Myrick testified that if there was snow, Belt Railway would use the Argo location as the drop-off site.

¶ 16    Myrick also described a second alternative drop-off location where he had previously been dropped off: under the Harlem Avenue bridge. Myrick testified that the road under that bridge could be used to access a well lit drop-off area that Belt Railway kept plowed during the winter. Wiley Brown, who was the foreman in training on March 7, 2013, testified as part of the offer of proof that conductors "normally" used the road under the Harlem Avenue bridge to access the second alternative drop off location.

¶ 17    The jury returned a verdict in favor of defendants. Myrick moved for a new trial, arguing that the alternative drop-off locations were both relevant and admissible. He argued that under the Restatement (Second) of Torts and Illinois case law, evidence of custom and practice was admissible to establish what a reasonably prudent railroad would have done under the circumstances, and that the circuit court's ruling on defendants' motion *in limine* was "clearly wrong." The circuit court denied the motion, and Myrick filed a timely notice of appeal.

ANALYSIS

On appeal, Myrick argues that the circuit court abused its discretion as a matter of law by "failing to apply Illinois evidence law regarding admissibility of custom and practice evidence to establish the standard of care," since the procedural rules of the forum apply in FELA cases brought in state court. He further argues that our review is *de novo* because the circuit court's decision to exclude evidence that Belt Railway previously dropped off employees at other safer alternative locations was based on an erroneous conclusion of law that deprived the jury of the necessary factual context to determine the applicable standard of care.

Defendants argue, however, that the admissibility of evidence regarding alternative drop-off locations is governed by federal law because it "relates to the duty imposed under FELA on [d]efendants, which is unquestionably a substantive, rather than a procedural, legal question." They contend the standard of review is for an abuse of discretion because the circuit court did not ignore or misapply any clear, bright-line rule.

We generally review a circuit court's evidentiary rulings for an abuse of discretion. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 92 (1995). A circuit court abuses its discretion only if it acts arbitrarily without the employment of conscientious judgment, exceeds the bounds of reason and ignores recognized principles of law, or if no reasonable person would take the position adopted by the court. *Schmitz v. Binette*, 368 Ill. App. 3d 447, 452 (2006). If a circuit court's decision rests on an error of law, then it is clear that an abuse of discretion has occurred, as it is always an abuse of discretion to base a decision on an incorrect view of the law. *Silverberg v. Haji*, 2015 IL App (1st) 141321, ¶ 34 (citing *People v. Porter-Boens*, 2013 IL App (1st) 111074, ¶ 10). To determine whether the circuit court applied the wrong legal standard in exercising its discretion requires us to first determine the correct legal standard, which is a question of law that we review *de novo*. *Shulte v. Flowers*, 2013 IL App (4th) 120132, ¶¶ 23-24.

To prevail in an action under FELA, Myrick needs to prove the traditional common law elements of negligence: duty, breach, causation, and damages. *Borger v. CSX Transportation, Inc.*, 571 F.3d 559, 563 (6th Cir. 2009); *Consolidated R. Corp. v. Gottshall*, 512 U.S. 532, 538 (1994). Federal common law governs substantive matters, including what constitutes negligence under FELA (*Urie v. Thompson*, 337 U.S. 163, 174 (1949)); the burden of proof on the merits (*Central Vermont Ry. Co. v. White*, 238 U.S. 507, 510-11 (1915)); the sufficiency of the evidence (*Brady v. Southern Ry. Co.*, 320 U.S. 476, 479 (1943), *abrogated on other grounds by CSX Transportation, Inc. v. McBride*, 564 U.S. 685 (2011)); and the substantive law to be conveyed in the jury instructions (*Norfolk & Western Ry. Co. v. Liepelt*, 444 U.S. 490, 493 (1980)). The negligence of the employer may be determined by viewing its conduct as a whole. *Blair v. Baltimore & Ohio R.R. Co.*, 323 U.S. 600, 604 (1945).

When a FELA action is brought in state court, the law of the forum governs procedural matters. *Central Vermont Ry.*, 238 U.S. at 511. This includes state procedural rules governing pleadings, verdicts, the form of the jury instructions, and the admissibility of evidence, unless the application of a state rule diminishes, destroys, or interferes with a right or obligation created by FELA. See *CSX Transportation, Inc. v. Begley*, 313 S.W.3d 52, 59-60 (Ky. 2012) (collecting cases); see also *Noakes v. National R.R. Passenger Corp.*, 363 Ill. App. 3d 851, 854 (2006) (citing *Marlowe v. Atchison, Topeka & Santa Fe Ry. Co.*, 671 P.2d 438, 442 (Colo. App. 1983)); *CSX Transportation, Inc. v. Miller*, 858 A.2d 1025, 1059 (Md. Ct. Spec. App. 2004) ("In a FELA case being tried in a state court, the state court will apply federal

substantive law but state procedural law, including the state law of evidence."); *Norfolk Southern Ry. Co. v. Estate of Wagers*, 833 N.E.2d 93, 101 (Ind. Ct. App. 2005) ("When FELA actions are adjudicated in state courts, they follow state procedural rules, even though the proceedings are governed by federal substantive law."); *Dalka v. Wisconsin Central, Ltd.*, 2012 WI App 22, 339 Wis. 2d 361, 811 N.W.2d 834 (applying state rules of evidence regarding admissibility of evidence in a FELA case).

¶ 24 In granting plaintiff's motion *in limine*, the circuit court stated that it had reviewed the cases cited by the parties and determined that the "focus should be on where the accident happened" because "to do otherwise would *** impose an additional burden on the defendant that is not required under FELA *** to start explaining why they didn't drop him off someplace else when they don't really have to do that" and that "there's no obligation to put him at this other alternative site." The circuit court stated that the plaintiff would have "ample opportunity" to show how defendants' decision as to where Myrick was dropped off was negligent. These remarks suggest that the circuit court did not believe that evidence regarding alternative drop-off locations was relevant.

¶ 25 In considering Myrick's contention that testimony about the two alternative drop-off sites was admissible to prove the standard of care, we observe that it is undisputed that "[a]ll relevant evidence is admissible, except as otherwise provided by law. Evidence which is not relevant is not admissible." Ill. R. Evid. 402 (eff. Jan. 1, 2011). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). Relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 26 We agree with Myrick that Illinois evidence law governs the procedural process of admitting evidence in a FELA case brought in Illinois. We also agree with defendants that federal law is determinative of whether conduct is negligent under FELA. We therefore look to federal law to determine what constitutes relevant evidence of negligence in a FELA case, and then apply our own rules of evidence governing admissibility, provided they do not diminish, destroy, or interfere with any federal right under FELA.

¶ 27 We find *Stone v. New York, Chicago & St. Louis R.R. Co.*, 344 U.S. 407 (1953) instructive on the issue of whether Myrick's evidence of alternative locations used by Belt Railway to drop off employees is relevant under the facts of this case, and whether the jury should have considered this evidence in deciding whether the railroad was negligent. In *Stone*, railroad workers were tasked with removing old railroad ties, which usually required two men using tongs, but could require up to four men. *Id.* at 408. The evidence showed that there were three other possible methods for safely removing a stubborn tie. *Id.* When the plaintiff and another man encountered a stubborn tie, rather than using one of these other three methods, the "straw boss" instructed the plaintiff to pull harder. *Id.* Plaintiff pulled on the tie and sustained injuries to his back. *Id.* Plaintiff sued the railroad under FELA, and a jury returned a verdict in his favor. *Id.* at 407.

¶ 28 The Missouri Supreme Court reversed, finding that the plaintiff had failed to establish triable issues regarding negligence or causation, since "there was no evidence that defendant's methods were not reasonably safe," and "[t]here was no evidence that plaintiff exerted more strength because of lack of sufficient help." *Stone v. New York, C. & St. L. R. Co.*, 249 S.W.2d

- 7 -

442, 449 (Mo. 1952). The United States Supreme Court reinstated the verdict, finding that the case was "peculiarly one for the jury." *Stone*, 344 U.S. at 409. The Court stated that "[w]hether the straw boss in light of the risks should have used another or different method to remove the tie or failing to do so was culpable is the issue." *Id.* This created a "debatable issue on which fair-minded men would differ." *Id.* The Court further noted that:

> "The experience with stubborn ties, the alternative ways of removing them, the warning by [plaintiff] that he had been pulling as hard as he could, the command of his superior to pull harder, the fact that more than two men were usually used in these circumstances—all of these facts comprise the situation to be appraised in determining whether [the defendant] was negligent. Those circumstances were for the trier of fact to appraise." *Id.* at 409-10.

Although *Stone* did not involve a question of admissibility of evidence regarding alternative methods, the Court determined that the plaintiff had presented sufficient evidence to warrant submitting the case to the jury on the issue of negligence and causation, since there was a "debatable issue on which fair-minded men would differ" as to whether the defendant was negligent.

¶ 29    In *Stone*, the Court reasoned that evidence of the three alternative methods to safely remove a tie was relevant to the issue of whether the method employed by the straw boss was negligent under all of the circumstances presented. In a similar vein, Myrick's proposed evidence that the railroad had available to it two separate and safer locations should have been considered by the jury in its determination of whether the defendants acted reasonably under the circumstances existing at the time of the injury. As Myrick argues, if presented with evidence concerning the Argo and Harlem Avenue sites, the jury could have reasonably concluded that Belt Railway was negligent in providing a safe work place by (1) dropping Myrick at an unlit location that had an uneven surface with two feet of snow covering the railroad tracks and (2) not dropping Myrick at one of the two other locations available to it at the time of the injury, locations that were frequently used, well lit with an even surface, and relatively free of snow. Without this evidence, the jury was denied relevant evidence to compare what available options the defendants had to determine whether defendants acted reasonably by dropping him off where he was dropped off. Under FELA, the "slightest" evidence of negligence is sufficient to find liability. *Rogers v. Missouri Pacific R.R. Co.*, 352 U.S. 500, 506 (1957). Here, Myrick was deprived of a fair opportunity to present relevant evidence that would assist the jury in making a determination of whether a breach of the standard of care was more probable or less probable.

¶ 30    Several courts applying *Stone* have allowed evidence of safer alternative methods because such evidence is or may be relevant to the issue of reasonable care. See, *e.g.*, *Prescott v. CSX Transportation, Inc.*, No. CV512-013, 2013 WL 1192820 (S.D. Ga. Mar. 22, 2013); *Williams v. Northeastern Illinois Regional Commuter R.R. Corp.*, No. 00 C 2250, 2002 WL 1433724 (N.D. Ill. June 28, 2008); *Edsall v. CSX Transportation, Inc.*, No. 1:06-CV-389, 2007 WL 4608788 (N.D. Ind. Dec. 28, 2007); *Uhl v. CSX Transportation, Inc.*, No. 3:08-0064, 2009 WL 1749372 (S.D. W. Va. June 18, 2009); *Robinson v. CSX Transportation, Inc.*, 103 So. 3d 1006 (Fla. Dist. Ct. App. 2012).

¶ 31    Defendants argue, however, that under *Stillman v. Norfolk & Western Ry. Co.*, 811 F.2d 834 (4th Cir. 1987), evidence of the alternative drop-off locations was not admissible because the question for the jury was whether the railroad exercised reasonable care for Myrick's

safety, not whether defendants could have employed safer methods for performing the task of transporting employees to their destinations. The circuit court found *Stillman* persuasive in denying Myrick's attempt to introduce evidence of the alternative locations. Our review of relevant case law finds that reliance on *Stillman* was misplaced and that it was error to bar the proffered evidence.

¶ 32     In *Stillman*, the plaintiff worked for a railroad installing gears in railroad cars. To perform this task, the gears were attached to chains, which were then hooked on to the blades of a forklift and lifted up so that the gears could be placed in the railroad cars. *Id.* at 836. While plaintiff was performing this task, the forklift stopped working. The plaintiff placed himself under the suspended gear while trying to free the chain from the blades, and the forklift's blades fell and injured him. *Id.* He sued under FELA, and at the jury trial, plaintiff sought to introduce evidence that using overhead cranes would have been a safer way to install the gears. *Id.* at 838. The plaintiff had introduced "essentially all" of the testimony regarding his alternative method testimony before the circuit court sustained the railroad's objection. The district court excluded the evidence, reasoning that the focus was on "whether the Railroad had exercised reasonable care, not whether the procedures used by the Railroad could have been made safer." *Id.* The district court did not instruct the jury to disregard the testimony it heard about plaintiff's alternative method. The Court of Appeals for the Fourth Circuit affirmed, finding that it was within the district court's discretion to exclude the plaintiff's irrelevant testimony "concerning the alternative gear installation method." *Id.*

¶ 33     Our view of *Stillman* is that it does not stand for the proposition that evidence of alternative methods is always inadmissible to prove negligence. *Stillman* and its progeny stand for the proposition that, while an employer has a duty to provide a reasonably safe work environment, the provision of certain tools or the utilization of a particular method of doing a task is not negligent simply because the employer failed to provide or utilize a better or safer method of performing a task. See *Combs v. Norfolk & Western Ry. Co.*, 807 S.E.2d 355, 359 (Va. 1998) (observing that *Stillman* involved "a party's attempt to prove negligence 'in a vacuum' by showing that safer equipment could have been used, irrespective of whether the equipment actually used met the standard of reasonable care"); see also *McKennon v. CSX Transportation, Inc.*, 897 F. Supp. 1024, 1026-27 (M.D. Tenn. 1995) (rejecting plaintiff's argument that defendant was negligent for refusing to use an available automated method of performing a task where the method actually used was safe and appropriate).

¶ 34     Under the reasoning in *Stone*, evidence of an alternative method of performing a task may be relevant if it is offered to show that the method actually used fell below the standard of care. The principle in *Stillman* may be invoked to bar evidence of alternative methods of performing a task when there has been no showing that the method actually employed was unsafe. In other words, a plaintiff cannot attempt to prove the defendant's negligence by pointing to alternative methods without first offering some evidence that the method used was negligent. Once a plaintiff comes forward with some evidence that the method actually employed was not reasonably safe, he may then seek to introduce evidence that safer alternative methods existed, that those methods were available at the time, and that they had been used under similar circumstances, since that evidence may be relevant to whether the method actually used was reasonable under all of the circumstances. See *Williams*, 2002 WL 1433724, at *9 ("Only when it is determined that the railroad exercised reasonable care is testimony regarding safer alternatives properly excluded.").

¶ 35    In *Prescott*, 2013 WL 1192820, at *5, the district court denied as premature the defendant's motion *in limine* to bar references to alternative, safer methods after observing that such evidence could be relevant to the issue of reasonable care, a point which CSX's own motion acknowledged. That court stated that it would "determine the admissibility of any such evidence offered at trial in accordance with the applicable rules." *Id.*; see also *Cook v. CSX Transportation, Inc.*, No. 6:06-cv-1193-Orl-19KRS, 2008 WL 2275544, at *3 (M.D. Fla. June 2, 2008) (same).

¶ 36    In *Williams*, the plaintiff was injured while using a sledgehammer to break concrete on a railroad platform. Metra moved for summary judgment, claiming it had no notice that a sledgehammer was unsafe for breaking concrete. Plaintiff produced evidence in discovery showing that if either of his superiors had known that concrete would be encountered, they would have provided Williams with either a hiltie or a jackhammer. The district court denied Metra's motion for summary judgment because "Williams has brought forth enough evidence to question whether Metra's use of the sledgehammer was reasonable and whether a safer alternative method was available." *Williams*, 2002 WL 1433724, at *8. In part, the district court rejected Metra's argument that the sledgehammer was "the safest tool to use on the job" because witnesses established that this tool "may not have been the appropriate tool for breaking up the concrete." *Id.* at *8-9 (plaintiff is permitted "to bring forth evidence of safer, alternative methods to show that the defendant was negligent in not providing such methods" (citing *Stone*, 344 U.S. at 409)). The district court concluded that "*Stone* requires that the trier of fact determine whether the method was reasonable. [*Stone*,] 344 U.S. at 409. Only when it is determined that the railroad exercised reasonable care is testimony regarding safer alternatives properly excluded. *Stillman*, 811 F.2d at 838." *Id.* at *9. The district court found that Williams's evidence—consisting of a supervisor who said a jackhammer is often used to break concrete and an expert who said plaintiff should have been provided a jackhammer, a sledgehammer is more difficult to control, and a jackhammer or similar tool should have been used on the concrete instead—was sufficient to find that "the sledgehammer's safety and the availability of a safer alternative are genuine issues of material fact that prohibit a finding of summary judgment." *Id.*

¶ 37    *Williams* was cited with approval in *Edsall*, 2007 WL 4608788. Edsall injured his back pulling spikes with a claw bar because a hydraulic spike puller had been in the repair shop for several weeks. Edsall claimed that if he had "the proper tool," he would not have used the claw bar and he would not have been injured. *Id.* at *2. Defendant claimed that Edsall failed to prove it was negligent in providing a reasonably safe work environment because Edsall's argument was that it failed to provide a " 'safer' or preferred alternative for pulling spikes does not mean that what it did give him, the claw bar, was unreasonably unsafe." *Id.* at *3. The district court determined, however, that "the issue of what is reasonably safe cannot be viewed in a factual vacuum." *Id.* at *4. The district court concluded that:

> "As this Court has previously observed, a FELA defendant has a duty 'to exercise reasonable care in providing a reasonably safe place to work, reasonably safe conditions in which to work and reasonably safe tools and equipment.' [Citation.] On this record, it must be left to the jury to determine whether CSXT was reasonable in providing Edsall with only a claw bar to pull a spike from a new tie in an area it knew was freshly damaged from a derailment and thus likely to contain poor footing. Part of that analysis necessarily entails an examination of the alternative method for removing

such a spike, [citation]; that is, a machine that if it had been available on February 26, 2004, would have afforded Edsall with an arguably safe way to approach the situation involving the third spike. Altogether, whether CSXT provided Edsall with a reasonably safe place to work under the circumstances is 'peculiarly for the jury.' *Stone*, 344 U.S. at 409." *Id.* at *5.

¶ 38     *Williams* and *Edsall* were both cited with approval in *Uhl*, 2009 WL 1749372. In *Uhl*, the plaintiff was injured while boarding a locomotive, and he intended to present evidence that there was a safer alternative location to board the train. *Id.* at *5. The railroad moved *in limine* to bar plaintiff's evidence, contending such evidence was irrelevant, principally relying on *Stillman*. The district court denied the railroad's motion and relied on *Stone* to explain that the issue was whether the railroad exercised reasonable care. *Id.* at *7. The *Uhl* court noted that *Stillman* presented a different factual scenario, since Stillman's trial evidence indicated that the defective forklift appeared to be an isolated event and that exclusion of evidence of safer alternatives is proper only where it is determined that the railroad exercised reasonable care. *Id.* The district court found that Uhl "represents that he will introduce evidence that requiring him to board locomotives at the location where his alleged injury occurred constituted an unreasonably safe method of carrying out that task" and that the case "involves a dispute as to whether the railroad exercised reasonable care." *Id.* The district court concluded that "the jury should be given the benefit of considering alternative boarding locations to aid it in arriving at an answer." *Id.*

¶ 39     The facts in *Uhl* and those proffered by Myrick differ only in that Uhl boarded a train in an allegedly unsafe location when a safer alternative location was available, whereas Myrick got off the train in an allegedly unsafe location when two safer alternative locations were available. And, like the analysis and ruling in *Edsall*, in this case "part of the analysis" of whether defendants provided a reasonably safe place to work under reasonably safe conditions necessarily entails an examination by the jury of "the alternative method" for transporting Myrick to the engine. The jury should have been allowed to consider the evidence of the other available drop-off locations that the defendants had previously used to determine whether it was reasonable for defendants to drop Myrick off in the location where he was dropped off, or in other words, whether dropping Myrick off at either Argo or Harlem Avenue would have afforded him a reasonably safe place to work.

¶ 40     *Robinson*, 103 So. 3d 1006, is also instructive. There, the appellate court reversed a defense verdict involving a plaintiff who was injured when his train collided with a truck. Plaintiff alleged that the railroad failed to provide him with certain safety tools regularly used in performing his job that would have allowed him to avoid the collision. The trial court excluded evidence regarding the railroad's failure to provide those safety tools. The appellate court reversed, finding that "[t]he evidence was relevant—regardless of whether the tools were immediately available on the day of the accident—because it tended to prove that CSX breached its duty to provide a safe workplace by failing to make the tools available, despite their general use in the industry." *Id.* at 1009. See also *Gorman v. Grand Trunk Western R.R., Inc.*, No. 2:07-cv-12911, 2009 WL 2448604, at *6 (E.D. Mich. Aug. 10, 2009) (noting that "whether any given arrangement is reasonably safe cannot be determined *** without any consideration of possible alternative arrangements. Instead, whether the conditions of a workplace are reasonably safe depends on a comparison of the marginal benefits and costs of an available safer alternative.").

¶ 41    Here, the circuit court found that evidence of alternative drop-off locations was not relevant to the issue of whether defendants' conduct was reasonable under the circumstances. Myrick's theory of liability was that the location where he was dropped off was unsafe and that dropping him off at that location under poor conditions was a breach of defendants' duty because a reasonably prudent railroad would have used available and safer alternative drop-off locations. He presented at least some evidence from which a jury could conclude that defendants' conduct in dropping him off in an unfamiliar, unlit, uneven, and snow-covered location was negligent. He therefore should have been permitted to introduce evidence that there were alternative, previously-used and available drop-off locations to show that defendants failed to act as a reasonably prudent railroad under all the circumstances. Similar to *Williams* and *Uhl*, Myrick was arguably dropped off at an unsafe location when the railroad knew or should have known that safer locations at Harlem Avenue or Argo were available to drop plaintiff. *Robinson* and *Gorman* further support a finding that alternative drop-off locations are relevant under FELA. By applying the reasoning in *Stillman*, the circuit court applied the wrong legal standard with respect to relevancy and therefore abused its discretion in granting defendants' motion *in limine* and in denying Myrick's motion for a new trial. Where the circuit court's error is one of law, we remand for a new trial. *Tankersley v. Peabody Coal Co.*, 31 Ill. 2d 496, 504 (1964).

¶ 42                                            CONCLUSION

¶ 43    The circuit court applied the wrong legal standard in considering plaintiff's evidence of alternative drop-off locations, and thus abused its discretion in granting the defendants' motion *in limine* to bar that relevant evidence and in denying Myrick's motion for a new trial. These errors warrant a new trial.

¶ 44    The judgment of the circuit court is reversed, and this matter is remanded for a new trial.

¶ 45    Reversed and remanded.