# Illinois Official Reports

## Appellate Court

<div style="border:1px solid black;">

### *Bahus v. Union Pacific R.R. Co.*, 2019 IL App (1st) 180722

</div>

| | |
|---|---|
| Appellate Court Caption | WILLIAM BAHUS, Plaintiff-Appellant, v. UNION PACIFIC RAILROAD COMPANY, Defendant-Appellee. |
| District & No. | First District, Fourth Division<br>Docket No. 1-18-0722 |
| Filed | June 28, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-L-1806; the Hon. Marcia Maras, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | John S. Bishof Jr., of Law Office of John Bishof, P.C., of Chicago, for appellant.<br><br>J. Timothy Eaton and Jonathan B. Amarilio, of Taft Stettinius & Hollister LLP, and Thomas A.P. Hayden and Brody E. Dawson, all of Chicago, for appellee. |
| Panel | JUSTICE BURKE delivered the judgment of the court, with opinion.<br>Presiding Justice McBride and Justice Reyes concurred in the judgment and opinion. |

**OPINION**

¶ 1  Plaintiff William Bahus appeals the circuit court's order granting summary judgment to defendant, Union Pacific Railroad Company (Union Pacific), on his claim seeking to recover for a workplace injury he suffered. For the reasons that follow, we affirm the circuit court's judgment.

¶ 2  I. BACKGROUND

¶ 3  A. The Complaint

¶ 4  Bahus filed his complaint under the Federal Employers' Liability Act (FELA) (45 U.S.C. § 51 *et seq.* (2012)), alleging that on February 17, 2014, he injured his left knee while kneeling to perform maintenance on a "GURU" valve on a Union Pacific locomotive engine. Bahus alleged that, after kneeling on a walkway to reset and reinsert the GURU valve, he felt pain in his left knee when he stood up. Bahus alleged that, as a result of Union Pacific's negligence, he sustained serious and permanent injuries to his left knee, including a lateral meniscus tear and aggravation of a preexisting condition. Specifically, Bahus alleged that Union Pacific was negligent in that

"a. Defendant negligently failed to provide Plaintiff with a reasonably safe place to work;

b. Defendant replaced electric valves with guru valves which require employees to kneel in awkward positions when re-setting and re-arming the plug of the valve. The electric valve does not require a manual re-setting and re-arming of the plug of that valve and thus does not require the defendant's employees to place themselves in awkward positions;

c. In negligently creating and permitting dangerous and hazardous conditions to exist;

d. Other acts of negligence."

¶ 5  Following discovery, Union Pacific filed a motion for summary judgment pursuant to section 2-1005(c) of the Code of Civil Procedure (735 ILCS 5/2-1005(c) (West 2016)). Each party attached several exhibits to their filings, which we summarize in pertinent part below.

¶ 6  B. Factual Background

¶ 7  Bahus testified in his deposition that he began working as a machinist in 1994 for a railway company subsequently purchased by Union Pacific. On February 17, 2014, he was working as a machinist/mechanic for Union Pacific. He was assigned to work on locomotives at the Indiana Harbor Belt Railway. Bahus testified that it was a "pretty typical winter day" and several locomotives had arrived overnight "dead and drained," meaning they were not running and the water in the engines' cooling systems had drained out of the engines.

¶ 8  Bahus explained that, when the outside temperature is cold and the water in the engine reaches approximately 38 degrees, the GURU valve opens and the water drains out of the engine and associated components before it can turn to ice and cause freeze damage. Bahus's job was to reset the GURU valves after they opened. He accessed the GURU valves through the engine access door. He had to kneel down and then reach out approximately 3 feet and down approximately 18 inches. He first cleaned the GURU cartridge and the valve body to

remove any ice, then reinserted the cartridge by pushing it in and twisting. The reinsertion process took 5 to 20 minutes. The GURU valve had to be positioned facing straight down or at a 45-degree angle to allow water to drain out. However, Bahus testified that, if the valve was angled 45-degrees away from him, it was difficult to reach it and reinsert it because of the awkward position he had to be in. Bahus explained that locomotives originally had electric valves that were easily reset by simply flipping a switch but electric valves would not operate if the engine batteries were dead. He testified that Union Pacific retrofitted its existing locomotives with GURU valves, which require nothing other than temperature to operate. He did not recall if he had ever reported to anyone his belief that reinserting GURU valves was unsafe.

¶ 9     He testified that, on the date of the incident, he was working on a GURU valve located on an air compressor on a locomotive engine for approximately 20 minutes and, when he stood up, he felt pain in both knees. He initially believed it was from the cold air temperature and kneeling on the steel walkway. He had already worked on four to seven other GURU valves. When Bahus warmed up, the pain subsided. Bahus testified that the GURU valve on this particular engine was "positioned at an awkward spot on the water return line, so it was out away from the air compressor, more underneath the oil cooler and all the other associated equipment." He testified that the GURU valve was also installed facing away from the access door and there was "no room to install it straight down because there wouldn't have been a drop between the pipe and the floor of the locomotive." He testified that he had to lean forward while reaching around, through, and under other engine equipment, and line the valve and cartridge up and reinsert it, but it was so cold outside that "things were icing up almost as quickly as you took the torch off of it." He was eventually able to reinsert the valve. He testified that this was a "one-person job," as there was physically no room for anyone else to help. When he stood up, he felt pain in both of his knees. Bahus testified that Union Pacific provides knee pads, which have a hard plastic surface backed by a soft surface. He testified that the knee pads are difficult to wear, as they do not fit well around winter layers. He used a kneeling pad instead, which was a foam pad approximately one inch thick and also provided by Union Pacific. He was able to finish the three or four remaining hours of his shift. He did not continue having pain in his knees that day. He went home at the end of the shift but later returned to check the 8 p.m. train.

¶ 10    The next morning, as he cleaned snow off of his truck, he noticed pain in his left knee, and he reported the injury to Union Pacific. A nurse evaluated him. She found no traumatic injury, but Bahus desired to have it evaluated further at the hospital. The emergency physician at the hospital also found no traumatic injury. Bahus completed an injury report with Union Pacific.

¶ 11    Bahus testified that the next time he received treatment was in November 2014. He testified that, three weeks after the incident, his job was abolished and he was transitioned to a machinist job in Joliet and received a pay cut. He was also placed on discipline for failing to timely report the injury. He was diagnosed with chondromalacia, which he believed means a roughening and thinning of the cartilage in the joint. He had surgery on his left knee in June 2015. He stopped working in July 2015.

¶ 12    In addition to deposition testimony, Bahus submitted a video of a locomotive inspection demonstrating the location of a GURU valve, photographs of GURU valves, installation instructions printed from the manufacturer ThermOmegaTech, Union Pacific's Mechanical Maintenance Instructions (MMI) and Locomotive Maintenance Instructions (LMI) regarding

the GURU valve, a Mechanical Engineering Newsletter from Union Pacific, and a "MCS task" sheet from Union Pacific relating to conversion to GURU valves. The ThermOmegaTech instructions state that the GURU valve should be installed "with its cartridge down or at a 45 [degree] angle *** for best accessibility." It further states that the valve must be "installed with a 2.75 inch minimum operating clearance to allow cartridge to pop out." The MMI, LMI No. 3302, provided instructions to replace the electric valve with the GURU valve. It stated that "the GURU cartridge is to be facing down at a 45 degree angle from the horizontal" and there must be a two-inch minimum clearance below the valve to allow the cartridge to fall out. MMI, LMI No. 3304, provided the same instructions.

¶ 13    Bahus further attached the medical evaluation report of Dr. Chudik, performed on November 7, 2017. Dr. Chudik opined that "[t]he mechanics of bending, stooping, kneeling for an extended period of time and rising is a sufficient mechanism to aggravate and accelerate Mr. Bahus' knee condition as it did on February 17, 2014." Dr. Chudik opined that, within a reasonable degree of medical certainty, Bahus's condition resulted from the injury sustained on February 17, 2014.

¶ 14    Tom Kennedy, a project manager for Union Pacific in the mechanic service unit, testified in his deposition that Union Pacific decided to replace the electric valve with the GURU valve in order to protect engines from costly freeze damage. Kennedy testified that Union Pacific has retrofitted almost all of its locomotives with GURU valves and it is the industry standard. Union Pacific placed the GURU valves in the same location as the electric valves; they must be placed at the lowest part of the engine cooling system. He testified that the GURU valve is accessed through the engine access door by reaching down approximately one foot and reaching out approximately one to two feet and that kneeling pads and knee pads are provided. Kennedy testified that it takes less than one minute to reinsert the cartridge into the valve and make a quarter turn and that GURU valve reinsertion could be performed by a machinist, pipefitter, or service personnel mechanic. He was unaware of any complaints about the position of GURU valves.

¶ 15    Darek Szydlo, a senior manager of the locomotive department who has worked for Union Pacific since 1994, testified that he is familiar with the procedure for installing GURU valves, he has trained employees on installation, and he observes employees install them as part of his management auditing duties. He testified that there are few, if any, electric valves remaining because of the risk of freeze damage and Union Pacific transitioned to GURU valves over 10 years ago.

¶ 16    Szydlo testified that he did not believe the GURU valves that were retrofitted onto Union Pacific's locomotives were placed in locations that were difficult for employees to reach. Szydlo testified that the retrofitted GURU valves were generally located in the same area as the electric valves had been because there were only a "certain number of spots were you can put the GURU[s] in for them to work properly and drain all the water from the engine, the associated piping, the radiators, the air compressor basically so the locomotive doesn't freeze up or the components freeze up." He testified that the location of the GURU valve and the direction it faces is determined by the design of the locomotive. He testified that he has never found it difficult to install or repair a GURU valve and he has never received any complaints from an employee regarding the location of a GURU valve. He also has not received complaints about the kneeling pads Union Pacific provides.

¶ 17     Szydlo testified that he supervised Bahus in 2014 and had observed him handling GURU valves. Szydlo testified that Bahus's position was abolished in 2014 because processes changed and locomotives were being serviced at a different shop in order to address reliability issues at Indiana Harbor Belt Railway.

¶ 18     Union Pacific provided the report of William Jacobs of Heartland Rail Services, Inc., in which Jacobs opined that GURU valves are the industry standard and that it was a reasonably safe activity to change and service a GURU valve. Union Pacific also provided a report from engineer George Page in which he opined that the amount of time spent kneeling as a machinist was minimal, constituting about 1% of the work shift and about 6.5 minutes per GURU valve replacement, which did not contribute to the risk of knee disorders. He further concluded that there was no increased risk for knee disorders in replacing GURU valves. Page concluded that Union Pacific provides a safe work environment and provides knee pads or kneeling pads, safety training, and other assistance as needed. Union Pacific further submitted a medical evaluation of Bahus by orthopedic surgeon Dr. Jeffrey Meisles, in which Dr. Meisles determined that Bahus has osteoarthritis in his left knee, which caused his pain, but this was not caused or exacerbated by kneeling in cold weather.

¶ 19                              C. Motion for Summary Judgment Proceedings

¶ 20     In its motion for summary judgment, Union Pacific argued that Bahus failed to present any evidence of negligence; that is, Bahus failed to present any evidence that kneeling for twenty minutes was not reasonably safe and failed to present expert testimony or any evidence that it was not reasonably safe to require an employee to perform kneeling outdoors as part of his job. Bahus admitted that he did not complain that his task was unsafe and the decision to utilize GURU valves was reasonable, safe, and consistent with industry practice.

¶ 21     In response, Bahus argued that, under the FELA, his burden to prove negligence was slight, and expert testimony was not required. Bahus also asserted that he was not claiming that Union Pacific could have provided him with a safer method to perform his duties in servicing the GURU valves. Rather, he argued that Union Pacific could have "provided him with a reasonably safe place to work by simply installing the GURU valves in a manner so that he would not be exposed to the unnecessary and unsafe risk of injury." Bahus argued that Union Pacific's "use of GURU valves is not the issue in this case, it's the location where defendant placed them that makes repairing and servicing them" unsafe. Bahus asserted that the GURU valve should be installed 45 degrees facing in toward the engine access door.

¶ 22     In its reply brief, Union Pacific observed that Bahus had raised a new, different claim in asserting in his response that the negligence related to the placement of the GURU valve. Union Pacific argued that this new claim was essentially a defective design claim and was therefore precluded by the Locomotive Inspection Act (LIA) (49 U.S.C. § 20701 *et seq.* (2012)), which regulates the design, construction, and equipment selection and installation related to locomotive equipment. Union Pacific asserted that, in retrofitting locomotives, the GURU valves were placed in the same position as the previous electric valve and the location of the valves was determined by the manufacturer, not Union Pacific.

¶ 23     In Bahus's surreply, he asserted that the LIA requires that the locomotive must be "in use" at the time of injury but the locomotive on which he was working when he sustained the injury was not "in use" at the time because it was "dead and drained" when Bahus was assigned to service and repair it. Additionally, Bahus argued that Union Pacific determined the instructions

for retrofitting the GURU valves and its failure to position the GURU valves facing down or at a 45-degree angle toward the access door, instead of away from the access door, made it difficult and unsafe for an employee to reset or replace the GURU valve.

¶ 24    At the March 9, 2018, hearing on the motion, the circuit court entered summary judgment in favor of Union Pacific. The court found that Bahus needed expert testimony regarding Union Pacific's records and whether the GURU valve placement and installation was consistent with design standards and reasonably safe. As such, Bahus failed to provide sufficient evidence of negligence to survive summary judgment. The court additionally held that his claim was precluded by the LIA. Bahus filed a timely notice of appeal.

¶ 25                                   II. ANALYSIS
¶ 26                    A. Summary Judgment Standard of Review
¶ 27    "Summary judgment is appropriate when 'the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Shapich v. CIBC Bank USA*, 2018 IL App (1st) 172601, ¶ 16 (quoting 735 ILCS 5/2-1005(c) (West 2016)). We construe the record strictly against the moving party and liberally in favor of the nonmoving party. *Jordan v. The Kroger Co.*, 2018 IL App (1st) 180582, ¶ 17. The movant must demonstrate that some element of the claim must be resolved in his favor or that there is an absence of evidence supporting the nonmoving party's claim. *Rico Industries, Inc. v. TLC Group, Inc.*, 2018 IL App (1st) 172279, ¶ 44. If the movant satisfies this burden, the nonmovant need not prove his case but must "present some factual basis that would arguably entitle them to a judgment under the applicable law." *Williams v. Covenant Medical Center*, 316 Ill. App. 3d 682, 689 (2000). We review the trial court's grant of summary judgment *de novo*. *Jordan*, 2018 IL App (1st) 180582, ¶ 17. In so doing, we are not bound by the trial court's reasoning and may affirm on any basis in the record. *Rico Industries*, 2018 IL App (1st) 172279, ¶ 44.

¶ 28            B. Whether There Was Sufficient Evidence to Withstand Summary Judgment
¶ 29    Bahus argues on appeal that the circuit court erred in finding that he was required to provide an expert who could testify that Union Pacific's placement of the GURU valve was negligent. He contends that he presented sufficient evidence regarding causation and negligence based on his own testimony, Dr. Chudik's opinion, and common sense inferences available to a jury.

¶ 30    Bahus brought his action pursuant to the FELA (45 U.S.C. § 51 *et seq.* (2012)). "The purpose of FELA is to provide a remedy to railroad employees for injuries sustained from railroad accidents." *Hahn v. Union Pacific R.R. Co.*, 352 Ill. App. 3d 922, 929 (2004). The FELA provides the exclusive remedy for a railroad employee injured due to his employer's negligence. *Myers v. Illinois Central R.R. Co.*, 323 Ill. App. 3d 780, 785 (2001) (citing *Wabash R.R. Co. v. Hayes*, 234 U.S. 86, 89 (1914)). The FELA must be liberally construed to effectuate its purposes. *Id.*

¶ 31    To establish a negligence claim under the FELA, the plaintiff must prove that "(1) the defendant is a common carrier; (2) the plaintiff was an employee of the common carrier; (3) the plaintiff sustained an injury while employed by the common carrier; and (4) the defendant's negligence is a cause of the injuries." *Morris v. Union Pacific R.R. Co.*, 2015 IL App (5th) 140622, ¶ 32 (citing *Larson v. CSX Transportation, Inc.*, 359 Ill. App. 3d 830, 834 (2005)). As

such, in order "to survive a motion for summary judgment, a plaintiff must offer evidence that could prove 'the common law elements of negligence, including duty, breach, foreseeability, and causation.' " *Id.* ¶ 33 (quoting *Williams v. National R.R. Passenger Corp.*, 161 F.3d 1059, 1061-62 (7th Cir. 1998)).

¶ 32     Accordingly, the basis for liability is "the employer's negligence, not merely the fact that an employee is injured on the job." *Myers*, 323 Ill. App. 3d at 785. However, "[a] plaintiff's burden under FELA is significantly lighter than in a common law negligence case; a railroad will be held liable where 'employer negligence played any part, even the slightest, in producing the injury.' " (Emphasis omitted.) *Morris*, 2015 IL App (5th) 140622, ¶ 33 (quoting *Rogers v. Missouri Pacific R.R. Co.*, 352 U.S. 500, 506 (1957)); see also *Hahn*, 352 Ill. App. 3d at 930 (employee must show that the employer's negligence "played just the slightest part in producing his injury"). We additionally observe that "the sufficiency of evidence needed to withstand a motion for summary judgment in a FELA case is controlled by federal, not state, law." *Morris*, 2015 IL App (5th) 140622, ¶ 27.

¶ 33     It is undisputed that Union Pacific, as Bahus's employer, owed him a duty to provide "a reasonably safe workplace" under the FELA. *Id.* ¶ 34. To show a breach of this duty, the employee "must show circumstances in the workplace that the railroad could have reasonably foreseen as creating a potential for harm." *Id.* ¶ 35 (citing *McGinn v. Burlington Northern R.R. Co.*, 102 F.3d 295, 300 (7th Cir. 1996)).

¶ 34     In Bahus's complaint, he alleged that Union Pacific was negligent in replacing electronic valves with the GURU valves, which required employees to kneel in awkward positions when reinserting them. However, Bahus presented absolutely no evidence that the decision to switch from electronic valves to GURU valves was negligent. Indeed, all the evidence, including the testimony of Kennedy and Szydlo in addition to Jacobs's report, showed that GURU valves have become the industry standard.

¶ 35     Additionally, Bahus also failed to present any evidence that requiring its mechanics to kneel in an "awkward" position constituted a working condition that was not reasonably safe. In analyzing FELA claims, federal courts have concluded that requiring an employee to perform a physically difficult task or manual labor does not establish that the work was not reasonably safe or the employer was negligent, even where other, safer methods were available. *Walker v. Northeast Regional Commuter R.R. Corp.*, 225 F.3d 895, 897-99 (7th Cir. 2000) (railroad need only use a "reasonably safe method for lifting" heavy blade from floor to table, which did not require that it configure repair shop so that employee could use a lifting aid and there was no evidence presented that requiring mechanics to lift blade was not reasonably safe); see also *Deutsch v. Burlington Northern R.R. Co.*, 983 F.2d 741, 743-44 (7th Cir. 1992) (employee, who fell while descending ladder after setting the handbrake on top of a railroad car, presented no evidence that the location of the brake constituted a safety hazard or that the ladder rungs should have been equipped with a nonskid surface and thus failed to show existence of a material fact as to negligence).

¶ 36     Here, the testimony of Bahus, Kennedy, and Szydlo, in addition to Page's report, showed that mechanics must kneel to reset the valves for only a short period of time, ranging from one minute up to several minutes, depending on the circumstances, and this constitutes a negligible portion of the work shift, approximately 1%. Additionally, Union Pacific provided kneeling pads or knee pads to perform this task, and Bahus has not alleged that this was insufficient to provide reasonably safe working conditions.

¶ 37 Bahus subsequently refined his claim in the course of the summary judgment proceedings to assert that it was Union Pacific's placement of the GURU valves angled away from the engine access door that makes servicing them unsafe. He argues he presented sufficient evidence on this issue based on his own deposition testimony that it was difficult to service a GURU valve if it was angled away from the engine access door and he was injured while working on such a valve. He further contends that a safer alternative was available because Union Pacific could have installed the GURU valves in retrofitted locomotives differently by facing the valves toward the access door.

¶ 38 That a safer method of accomplishing a task may exist does not necessarily "render the chosen method unsafe or negligent for purposes of FELA." *McKennon v. CSX Transportation, Inc.*, 897 F. Supp. 1024, 1027 (M.D. Tenn. 1995); see *Taylor v. Illinois Central R.R. Co.*, 8 F.3d 584, 586 (7th Cir. 1993) (noting that evidence of a safer alternative was not necessarily proof of negligence where employee argued that other railroads used allegedly "safer" smaller ballast rocks); *Myrick v. Union Pacific R.R. Co.*, 2017 IL App (1st) 161023, ¶ 34 ("a plaintiff cannot attempt to prove the defendant's negligence by pointing to alternative methods without first offering some evidence that the method used was negligent"). The key question under FELA is whether the employer's prescribed method of performing the work is "reasonably safe, not whether the employer could have employed a safer alternative method for performing the task." *McKennon*, 897 F. Supp. at 1027.

¶ 39 For example, in *McKennon*, the employee was injured while using a spike maul to drive a spike in replacing damaged railroad ties when he injured his shoulder. *Id.* at 1025-26. The employee argued, *inter alia*, that the railroad should have provided a machine to assist in driving the spikes. *Id.* at 1026. The court held that "[t]he fact that there may have been an automated, or safer method, of work does not automatically render the chosen method unsafe or negligent for purposes of FELA." *Id.* at 1027. The court reasoned that the proper inquiry was whether the prescribed method of work was reasonably safe, not whether a safer alternative method existed, and the railroad was not negligent in failing to provide an automated or alternative method for performing the task. *Id.* Based on the testimony that the spike maul was not defective, was appropriate for using to drive spikes, and had been used by plaintiff safely for 20 years, the court found the failure to use a machine did not amount to negligence and granted summary judgment to the railroad. *Id.* The court also found the railroad was not negligent in not providing more employees or younger employees to do the work. *Id.*

¶ 40 Here, Bahus's own testimony that he was injured while working on a GURU valve and that Union Pacific could have installed the valve facing another way did not provide sufficient evidence of Union Pacific's negligence to survive summary judgment. Indeed, the evidence presented by both Bahus and Union Pacific showed that Union Pacific complied with the manufacturer's directions in installing the GURU valves and that they were installed in the same location that the electric valves had been. It is undisputed that the manufacturer's installation instructions indicated that the GURU valve should be installed facing down or at a 45-degree angle toward either side. Bahus contends that the fact that Union Pacific was given discretion to position the GURU valve within those parameters and it placed the valve facing away from the engine access door on the locomotive on which he was working constitutes evidence of negligence under the FELA. We disagree. Bahus had not provided any evidence that Union Pacific negligently breached its obligation to provide a reasonably safe workplace

or that any negligence by Union Pacific "played any part" in his injury. *Morris*, 2015 IL App (5th) 140622, ¶ 33.

¶ 41 Bahus also argues Dr. Chudik's testimony provided evidence that the position he was required to be in to reinsert the GURU valve was unsafe. However, a close examination of Dr. Chudik's medical evaluation report of Bahus reveals that Dr. Chudik opined that "[t]he mechanics of bending, stooping, kneeling for an extended period of time and rising is a sufficient mechanism to aggravate and accelerate Mr. Bahus's knee condition as it did on February 17, 2014." Dr. Chudik opined that, within a reasonable degree of medical certainty, Bahus's condition resulted from the injury sustained on February 17, 2014. Dr. Chudik's report did not state that Union Pacific's placement of the GURU valve caused his injury or placed Bahus in an unsafe position when servicing it. The report also did not establish that kneeling constitutes an unsafe workplace activity. While Dr. Chudik's opinion may provide evidence of causation, the mere fact that Bahus was injured while performing the GURU valve reinsertion task does not show that Union Pacific breached its duty to provide a reasonably safe workplace.

¶ 42 Relatedly, Bahus contends that he was not required to provide an expert to testify, as the placement of the GURU valve was an issue that could be understood by laypersons.

¶ 43 Courts have "consistently rejected [the] position" that expert testimony is required to survive a motion for summary judgment on a FELA claim. *Lynch v. Northeast Regional Commuter R.R. Corp.*, 700 F.3d 906, 913-15, 918-19 (7th Cir. 2012) (no expert testimony needed regarding causal connection between improper installation of top rail of fence that fell and struck plaintiff, as a layperson could easily understand the connection and the plaintiff presented evidence that a properly cut and installed rail should not fall). "[U]nder FELA, circumstantial evidence alone can support a jury verdict, and expert testimony is unnecessary where the matter is within the realm of lay understanding and common knowledge." *Id.* at 914; see *Harbin v. Burlington Northern R.R. Co.*, 921 F.2d 129, 129-32 (7th Cir. 1990) (expert testimony regarding air quality in roundhouse was not required where evidence showed that there was no ventilation system, locomotives created exhaust fumes, the plaintiff was required to clean inside the boilers yearly, creating additional clouds of soot, and a doctor testified that inhalation of particulate matter could stress the heart and precipitate a heart attack, as jury could reasonably infer that employer's failure to take other precautions was negligent).

¶ 44 On the other hand, expert testimony in FELA cases is required "when conclusions as to the evidence cannot be reached based on the everyday experiences of jurors, making expert testimony necessary to evaluate the issue." *Huffman v. Union Pacific R.R.*, 675 F.3d 412, 419, 426 (5th Cir. 2012) (insufficient evidence of causation where the employee's injury or condition was never specifically identified as one of the conditions that could result when work was not performed properly). For example, in *Myers v. Illinois Central R.R. Co.*, the Seventh Circuit Court of Appeals observed that "when there is no obvious origin to an injury and it has multiple potential etiologies, expert testimony is necessary to establish causation." (Internal quotation marks omitted.) *Myers v. Illinois Central R.R. Co.*, 629 F.3d 639, 643 (7th Cir. 2010) (expert testimony was required where neither the plaintiff nor his doctors could point to a specific event, employee claimed injuries resulted from years of working for the railroad, and such "cumulative trauma injuries" involved gradual deterioration resulting in numerous disorders caused by repetitive work over time such that causation is not obvious to a layperson).

¶ 45 We find that, while a layperson could understand the connection between kneeling and injuring a knee, any negligence involving the installation and positioning of the GURU valves

would not be so obvious. Although Bahus contends that his own testimony about reinserting the GURU valve was sufficient to establish negligence, even his counsel conceded the complexities of the issue at the hearing on the motion for summary judgment. When the circuit court inquired what evidence he had that installation of the GURU valve was negligent, counsel responded that he had Union Pacific's engine repair records but they were "very difficult to read." Considering the evidence presented of Union Pacific's maintenance records, LMIs providing instructions about the GURU valve, the manufacturer's instructions about the GURU valve, and the evidence presented about the precise placement of the GURU valve along the engine pipes to ensure proper functioning, we agree with the circuit court's finding.

¶ 46    Union Pacific contends that Bahus failed to present any evidence that the injury was reasonably foreseeable. A FELA plaintiff "must show circumstances in the workplace that the railroad could have reasonably foreseen as creating a potential for harm." *Morris*, 2015 IL App (5th) 140622, ¶ 35 (citing *McGinn*, 102 F.3d at 300). " '[R]easonable foreseeability of harm' *** is indeed 'an essential ingredient of [FELA] negligence.' " (Emphasis omitted.) *CSX Transportation, Inc. v. McBride*, 564 U.S. 685, 703 (2011) (quoting *Gallick v. Baltimore & Ohio R.R. Co.*, 372 U.S. 108, 117 (1963)).

¶ 47    Our review of the record reveals that Bahus has not presented any evidence showing that Union Pacific could reasonably have foreseen that resetting the GURU valves was dangerous in the manner Bahus alleges or that the placement of the GURU valves was not reasonably safe. Here, Bahus conceded that he never made a similar complaint prior to filing his lawsuit. Szydlo and Kennedy testified that they had never received or heard of any complaints regarding the placement of the valves or any hazards in resetting them. Union Pacific presented undisputed evidence that GURU valves became the industry standard and replaced electric valves over a decade ago. The evidence presented also demonstrates, without contradiction, that Union Pacific retrofitted its locomotives with GURU valves in accordance with the manufacturer's instructions. Accordingly, there was no evidence that Union Pacific had any prior notice of problems with the placement or servicing of the GURU valves or that it could have reasonably foreseen a potential for harm.

¶ 48                    C. Preclusion by the Locomotive Inspection Act

¶ 49    In his other issue on appeal, Bahus contends that the circuit court erred in finding that his claim under the FELA is precluded by the LIA.

¶ 50    Where two federal statutes "address the same subject matter, one may implicitly repeal the other, resulting in a 'preclusion' analysis." *Grogg v. CSX Transportation, Inc.*, 659 F. Supp. 2d 998, 1011 (N.D. Ind. 2009). Preclusion occurs where there is either an "irreconcilable conflict between the statutes or a clearly expressed legislative decision that one replace the other." *Randolph v. IMBS, Inc.*, 368 F.3d 726, 730 (7th Cir. 2004). Although preemption case law "does not govern preclusion analysis ***, its principles are instructive insofar as they are designed to assess the interaction of laws that bear on the same subject." *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. ___, ___, 134 S. Ct. 2228, 2236 (2014).

¶ 51    As noted, the FELA is a general negligence statute, which "neither prohibits nor requires specific conduct by a railroad." *Waymire v. Norfolk & Western Ry. Co.*, 218 F.3d 773, 775 (7th Cir. 2000). By contrast, the purpose of the LIA is "the protection of employees and others by requiring the use of safe equipment," and it must be liberally construed to that end. *Lilly v. Grand Trunk Western R.R. Co.*, 317 U.S. 481, 486 (1943). The LIA provides, in relevant part,

that "[a] railroad carrier may use or allow to be used a locomotive or tender on its railroad line only when the locomotive or tender and its parts and appurtenances—(1) are in proper condition and safe to operate without unnecessary danger of personal injury." 49 U.S.C. § 20701 (2012). The LIA "does not create a right to sue but merely establishes a safety standard, the failure to comply with that standard is negligence *per se* under the FELA." *Coffey v. Northeast Illinois Regional Commuter R.R. Corp. (METRA)*, 479 F.3d 472, 477 (7th Cir. 2007). A rail carrier can violate the LIA in two ways: "A rail carrier may breach the broad duty to keep all parts and appurtenances of its locomotives in proper condition and safe to operate without unnecessary peril to life or limb, in violation of 45 U.S.C. § 23, or a rail carrier may fail to comply with the regulations issued by the [Federal Railroad Administration]." *McGinn*, 102 F.3d at 299.

¶ 52    The United States Supreme Court has stated that the power delegated by the LIA is a general one, which "extends to the design, the construction and the material of every part of the locomotive and tender and of all appurtenances." *Napier v. Atlanta Coast Line R.R. Co.*, 272 U.S. 605, 611 (1926). In enacting the LIA, Congress "manifest[ed] the intention to occupy the entire field of regulating locomotive equipment." *Id.* In enacting the LIA, the goal was to " 'prevent the paralyzing effect on railroads from prescription by each state of the safety devices obligatory on locomotives that would pass through many of them.' " *Kurns v. A.W. Chesterton Inc.*, 620 F.3d 392, 398 (3d Cir. 2010) (quoting *Oglesby v. Delaware & Hudson Ry. Co.*, 180 F.3d 458, 461 (2d Cir. 1999)). As such, "the LIA preempts a broad field relating to the health and safety of railroad workers, including requirements governing the design and construction of locomotives, as well as equipment selection and installation." *Id.* at 397.

¶ 53    Union Pacific contends that Bahus's claim is really a claim of defective design, which is precluded by the LIA. Union Pacific argues that, although a claim under federal law (FELA) and not state law is involved here, the weight of federal authority supports that Bahus's FELA claim is precluded by the LIA.

¶ 54    Bahus argues that he is not raising a defective design claim but, rather, arguing that Union Pacific's decision to place the GURU valve facing away from him constituted negligence. He further asserts that more recent federal case law dictates that his claim is not precluded by the LIA.

¶ 55    Union Pacific relies heavily on *Waymire*, 218 F.3d at 776-77, wherein the Seventh Circuit Court of Appeals determined that negligence claims under the FELA that are directly covered by an act similar to the LIA, the Federal Railroad Safety Authorization Act of 1994 (FRSA) (49 U.S.C. § 20101 *et seq.* (2000)), which regulates railroad safety, were precluded. The Seventh Circuit found that the plaintiff's FELA claims, that the train was traveling at an unsafe speed under the conditions (the train was traveling below the FRSA speed limit at the time of the collision) and that inadequate warning devices failed to prevent the injury, were precluded by the FRSA because the FRSA had regulations setting speed limits and requiring installation of certain types of warning devices. *Waymire*, 218 F.3d at 776-77. Thus, the FRSA already "covered" the field, precluding the FELA claims. The Seventh Circuit drew support from *CSX Transportation, Inc. v. Easterwood*, 507 U.S. 658, 661-62, 673-76 (1993), in which the United States Supreme Court found the plaintiff's state-law claim (that the train was operating at an excessive speed under the conditions, even though it was traveling slower than the speed limit set by the FRSA) was preempted by the FRSA because the FRSA regulated the area. *Waymire*, 218 F.3d at 775-76. The Seventh Circuit likened the FELA-based claims to state law claims

and cited the FRSA's goal of uniformity in finding the FELA claims were precluded. *Id.* at 776.

¶ 56    As Union Pacific observes, other courts have reached similar conclusions as the Seventh Circuit in *Waymire* in holding that "the FRSA precludes a FELA claim when [a Federal Railroad Administration] regulation covers the subject matter of that claim and the claim would impose additional duties on the railroad beyond those contemplated by the applicable regulation." *Monheim v. Union R.R. Co.*, 788 F. Supp. 2d 394, 401 (W.D. Pa. 2011); see *Nickels v. Grand Trunk Western R.R., Inc.*, 560 F.3d 426, 430 (6th Cir. 2009) (plaintiffs' FELA claim that railroad was negligent for failing to provide smaller and easier to walk on ballast was precluded by the FRSA); *Lane v. R.A. Sims, Jr., Inc.*, 241 F.3d 439, 443 (5th Cir. 2001) (FELA excessive speed claim precluded by the FRSA); *McCain v. CSX Transportation, Inc.*, 708 F. Supp. 2d 494, 504 (E.D. Pa. 2010) (plaintiff's claims based on size of track ballast were precluded under the FRSA, but not his claims based on repetitive squatting, bending, and climbing up ladders as they were not subsumed under FRSA regulations); *Norris v. Central of Georgia R.R. Co.*, 635 S.E.2d 179, 182-83 (Ga. Ct. App. 2006) (the FRSA precluded the plaintiff's FELA claim that railroad should have used smaller ballast); *Norfolk Southern Ry. Co. v. Denson*, 774 So. 2d 549, 556 (Ala. 2000) (no duty under the FELA, FRSA, or LIA to equip locomotives with air conditioning). Courts have reasoned that "the FRSA may preclude a FELA claim under an analysis that FELA is a negligence-based statute, and like state common law negligence claims, FELA negligence claims may not be used to impose duties beyond those imposed by Congress or the FRA." *Norris*, 635 S.E.2d at 182.

¶ 57    Based on this underlying reasoning, courts have applied the same preclusion analysis to FELA negligence claims covered by the LIA. For example, in *Monheim*, 788 F. Supp. 2d at 400-01, the plaintiff alleged that the railroad should have equipped the train with a deadman's switch or alerter, a cab wired for signal, and an ejection-proof seat. The railroad argued that the FELA-based claims were essentially " 'design' " and " 'failure to install claims' " precluded by the LIA and the FRSA. *Id.* at 400. Citing *Waymire* and similar federal courts of appeals cases, the *Monheim* court held that the plaintiff's FELA claims were precluded by the LIA because failure to have an alerter or deadman's switch on a nonpassenger train did not violate the LIA, the FRA regulations did not require cab signals, and FRA regulations required a seat to be " 'secure' " but not "ejection proof." *Id.* at 401. The court dismissed these claims because "allegations of design defect or failure to install are preempted by the LIA and, thus, are not cognizable under the FELA." *Id.* As the *Monheim* court observed, "[c]ompliance with the LIA preempts claims pertaining to the design and construction of locomotives, as well as equipment selection and installation." *Id.* at 400 (citing *Kurns*, 620 F.3d at 397; *Southern Ry. Co. v. Lunsford*, 297 U.S. 398, 402 (1936); *Mosco v. Baltimore & Ohio R.R.*, 817 F.2d 1088, 1091 (4th Cir. 1987)).

¶ 58    Bahus argues that his FELA claim is not precluded by the LIA based on the recent United States Supreme Court case *POM Wonderful*, 573 U.S. ___, 134 S. Ct. 2228. In that case, the Court held that the Food, Drug, and Cosmetic Act (FDCA) (21 U.S.C. § 343-1 (2006)) did not preclude a private cause of action under the Lanham Act (15 U.S.C. § 1125 (2006)) based on a misleading food label that was regulated by the FDCA. *POM Wonderful*, 573 U.S. at ___, 134 S. Ct. at 2237. The Court reasoned that neither act expressly limited or precluded Lanham Act claims, the preemption provision in the FDCA only expressly barred certain types of state

regulation, and the two statutory regimes complemented each other as each had its own scope and purpose. *Id.* at ___, 134 S. Ct. at 2237-39.

¶ 59    As Bahus observes in its reply brief, the United States District Court of the Central District of Illinois recently relied on the preclusion analysis employed in *POM Wonderful* in finding a FELA claim was not precluded by the FRSA despite the fact that the FRSA covered the same subject matter as the claimed negligence. *Jones v. BNSF Ry. Co.*, 306 F. Supp. 3d 1060, 1070 (C.D. Ill. 2017). The *Jones* court found that *POM Wonderful* had displaced *Waymire* "to the extent that the *Waymire* decision is premised on the idea that allowing federal claims about railroad safety undermines national uniformity." *Id.* The *Jones* court reasoned that *POM Wonderful* "explained that disuniformity from a system of varying state laws is 'quite different' from the 'variation in outcome' that may result from 'application of a federal statute *** by judges and juries in courts throughout the country.' " *Id.* (quoting *POM Wonderful*, 573 U.S. at ___, 134 S. Ct. at 2239-40).

¶ 60    However, we disagree with Bahus that *POM Wonderful* is controlling precedent that modifies our analysis in the present case. *POM Wonderful* simply applied preclusion analysis principles to the federal statutory regimes at issue in that case. The court merely looked to the particular provisions and purposes of the statutes and reasoned that neither act expressly precluded or limited Lanham Act claims and the regimes were complementary in regulating related, but different, interests. Thus, its conclusion that a private cause of action under the Lanham Act was not precluded by the FDCA has no bearing on the present case, which involves entirely different federal acts. The Supreme Court did not alter or overrule *Waymire*, and its decision in *POM Wonderful* did not impact its prior pronouncements regarding the LIA, *i.e.*, that it should be liberally construed to protect employees and others in requiring safe equipment (*Lilly*, 317 U.S. at 486); that the LIA confers general powers covering the design, construction, and material of "every part of the locomotive," its tender, and all appurtenances (*Napier*, 272 U.S. at 611); that the LIA is intended to occupy the "entire field of regulating locomotive equipment" (*id.*); and draws no distinction between hazards arising from repair and maintenance as those from use on the line (*Kurns v. Railroad Friction Products Corp.*, 565 U.S. 625, 634 (2012)). Accordingly, *POM Wonderful* does not alter our analysis here.

¶ 61    Bahus also relies on *Myers*, 323 Ill. App. 3d at 784-86, in which the Fourth District of the Illinois Appellate Court held that the plaintiff's FELA claim that the railroad negligently allowed its train to run 49 miles per hour, which was less than the set speed limit, at night and against the flow of traffic and without signals, was not precluded by the FRSA. *Myers* reasoned that *Easterwood*, which the *Waymire* court had relied on, did not address the effect of the FRSA on FELA claims and also left open the possibility that the FRSA would not preempt more specific speed-related tort claims such as failure to slow or stop to avoid a specific hazard. *Id.* at 786. The *Myers* court declined to follow the Seventh Circuit's *Waymire* decision on grounds that it was not required to follow Seventh Circuit precedent, the United States Supreme Court had not ruled on the issue, and there was a split of authority among lower federal courts. *Id.* at 786-87.

¶ 62    We recognize that Illinois courts "have considered federal circuit court decisions persuasive, but not binding in the absence of a decision of the United States Supreme Court." *State Bank of Cherry v. CGB Enterprises, Inc.*, 2013 IL 113836, ¶ 34. However, "uniformity of the law continues to be an important factor in deciding how much deference to afford federal court interpretations of federal law," and we will "give *considerable weight* to" federal courts'

uniform interpretation of a federal statute. (Emphasis in original.) *Id.* ¶ 35. In light of the concern for uniformity and for the reasons outlined above, we continue to follow *Waymire*.

¶ 63 In addition, we further observe that Bahus's claim that Union Pacific was negligent in positioning this valve plainly fell within the purview of the LIA, as it related to the design, construction, and "material of every part of the locomotive and tender and of all appurtenances." *Napier*, 272 U.S. at 611. That is, the GURU valves were an " 'integral or essential part of a completed locomotive,' " considering that without them, the water in the engine cooling system could freeze and cause catastrophic engine damage to the locomotive. *Grogg*, 659 F. Supp. 2d at 1012-13 (quoting *Lunsford*, 297 U.S. at 402 (the terms "parts" and "appurtenances" refers to whatever constitutes " 'an integral or essential part of a completed locomotive, and all parts or attachments definitely prescribed by lawful order of the [Secretary of Transportation], are within the statute' ")). The record is undisputed that the placement of the retrofitted GURU valves was a question of engine design and that Union Pacific followed the manufacturer's directions in installing the valves. The installation instructions required the valves to be located at a specific point in the engine—at the lowest drainage point to allow water to drain effectively—and that the valve be positioned facing down or at a 45-degree angle.

¶ 64 Preclusion aside, Bahus nevertheless contends that the LIA is inapplicable because the locomotive upon which he was working was not "in use" at the time, as required by the LIA, citing *Balough v. Northeast Illinois Regional Commuter R.R. Corp.*, 409 Ill. App. 3d 750, 757 (2011). In *Balough*, the court reviewed federal case law defining the term "in use" for purposes of a claim under the LIA and concluded that courts employ a multifactor analysis:

> "where the train was located at the time of the accident; the activity of the injured party; whether it is on a track in the rail yard prepared for departure or in the roundhouse for repair; whether it is being moved to a repair location or to a track for departure; and whether servicing and maintenance work have already been performed." *Id.* at 764.

However, in *Balough* the issue presented was not whether the plaintiff's claim was preempted or precluded by another federal statute; rather, the defendant railroad was challenging the jury's verdict against it on appeal. As Bahus is not making a claim under the LIA, we find *Balough* inapposite to our analysis. Additionally, we note that the United States Supreme Court has drawn no distinction "between hazards arising from repair and maintenance as opposed to those arising from use on the line." *Kurns*, 565 U.S. at 634 (finding that LIA preempted state common-law claims for defective design and failure to warn involving locomotive brakes and engine valves containing asbestos because they were directed at the equipment of locomotives).

¶ 65                                                III. CONCLUSION

¶ 66 We affirm the judgment of the circuit court granting summary judgment in favor of Union Pacific.

¶ 67 Affirmed.

- 14 -